# JOHNSON v. RIDDLE.

## ERROR TO THE SUPREME COURT OF THE STATE OF OKLAHOMA.

No. 161. Argued January 12, 1916.—Decided March 20, 1916.

Under the provisions relating to town sites in the Atoka Agreement between the United States and the Choctaw and Chickasaw tribes (found in Act of June 28, 1898, c. 517; 30 Stat. 495, 505, 508), the preferential right to purchase improved town lots was conferred upon the owner of "permanent, substantial, and valuable improvements, other than fences, tillage, and temporary houses," without regard to the lawfulness or unlawfulness of the previous possession of the land by the owner of the improvements.

Under the provisions of the Atoka Agreement relating to purchase of town lots (30 Stat. 508), and regulations contained in subsequent legislation, authority to appraise lots, improved or unimproved, to ascertain the ownership and value of the improvements, and to dispose of the lots in conformity to the provisions of the Agreement, was conferred upon the town site commission, and afterwards upon the United States Indian Inspector, subject to the supervision of the Secretary of the Interior.

In case of contest, the findings of fact by the Commission or the Inspector, affirmed on final appeal by the Secretary of the Interior, are binding upon the courts, in the absence of gross mistake or fraud, and the judicial inquiry is limited to determining whether there was clear error of law that resulted in awarding the right of purchase, and ultimately issuing the patent, to the wrong party.

The Atoka Agreement (Act of June 28, 1898, c. 517, 30 Stat. 505, 508), when ratified by Congress and by the Choctaw and Chickasaw tribes, superseded all customs, if such there were, that had sanctioned the leasing of town lots to non-citizens of the tribes; and its provisions could not be carried into effect without terminating existing rights of occupancy, if any, saving as these coincided with the ownership of permanent improvements.

A tenant is not estopped to show that his landlord's title has expired or has been terminated by operation of law.

That a tenant holding a town lot in the Chickasaw district of the Choctaw Nation, under lease from a non-citizen having no rights

in the land, had retained possession after refusal to pay rent, thereby preventing the landlord from erecting improvements such as described in the Atoka Agreement, did not estop the tenant who had erected substantial and permanent improvements thereon from acquiring the lot in his own right under the provisions of the Agreement.

41 Oklahoma, 759, affirmed.

THE facts, which involve the title to a town lot in the town of Chickasha in the Chickasaw District of the Choctaw Nation, and the construction and application of the townsite provisions of the Atoka Agreement, the Curtis Act and other statutes affecting the property of the Chickasaw and Choctaw tribes, are stated in the opinion.

*Mr. C. B. Ames*, with whom *Mr. Alger Melton* was on the brief, for plaintiffs in error:

The decision of the townsite board as approved by the Secretary of the Interior was based on an erroneous proposition, to-wit, that the effect of the Atoka Agreement was to terminate the relation of landlord and tenant. *Ellis v. Fitzpatrick*, 64 S. W. Rep. 567; *Ellis v. Fitzpatrick*, 118 Fed. Rep. 430; *Fraer v. Washington*, 125 Fed. Rep. 280; *Shy v. Brockhouse*, 7 Oklahoma, 35; *Walker Trading Co. v. Grady Trading Co.*, 39 S. W. Rep. 354; *Kelly v. Johnson*, 39 S. W. Rep. 352; *Williams v. Works*, 76 S. W. Rep. 246.

Under the Atoka Agreement as embodied in the Curtis Act which provides that the owner of the improvements shall have the right to buy one residence and one business lot at fifty per cent of the appraised value, a tenant who has wrongfully withheld possession of such a lot from his landlord, thereby preventing his landlord from erecting improvements thereon, cannot acquire title to the lot as against the landlord. *Rector v. Gibbon*, 111 U. S. 276; *Lamb v. Davenport*, 18 Wall. 307; *Atherton v. Fowler*, 96 U. S. 513; *Ricks v. Reed*, 19 California, 551; *Goode v. Gains*, 145 U. S. 141; *Trenouth v. San Francisco*, 100 U. S.

251; *Hagar* v. *Wikoff*, 2 Oklahoma, 580; *Downman* v. *Saunders*, 3 Oklahoma, 227.

The tenant having acquired a deed in violation of the rights of his landlord holds the title as trustee for his landlord. *Rector* v. *Gibbon*, 111 U. S. 276; *Baldwin* v. *Clark*, 107 U. S. 463; *Wallace* v. *Adams*, 143 Fed. Rep. 716; *James* v. *Germania Iron Co.*, 107 Fed. Rep. 597; *Trice* v. *Comstock*, 121 Fed. Rep. 620; *Bertran* v. *Cook*, 32 Michigan, 518.

*Mr. Joseph W. Bailey*, with whom *Mr. C. B. Stuart*, *Mr. W. A. Ledbetter* and *Mr. A. C. Cruce*, were on the brief, for defendant in error.

MR. JUSTICE PITNEY delivered the opinion of the court.

This was an action of ejectment, commenced before the admission of Oklahoma as a State in the United States Court for the Southern District of the Indian Territory, and brought to a conclusion in the state courts. There have been many changes of interest *pendente lite*, and corresponding changes of parties. The original plaintiffs were Riddle, now defendant in error, and one Cook, whose interest Riddle has since acquired. The interests of the original defendants have been acquired by plaintiffs in error through mesne conveyances that will be stated below. The subject of the action is a town lot in the town of Chickasha, in the Chickasaw district of the Choctaw Nation, to which plaintiff claimed title by purchase under the townsite provisions of the Atoka Agreement with the Choctaw and Chickasaw tribes, found in the act of Congress known as the Curtis Act (June 28, 1898, ch. 517; 30 Stat. 495, 505, 508), followed by a patent executed, after the commencement of the action, in accordance with the supplemental agreement with the same tribes (Act of July 1, 1902, ch. 1362, § 51; 32 Stat. 641, 653), and

set up in a supplemental complaint. The defendants admitted the legal title to be in Riddle, but by cross-complaint sought to have him declared a trustee for their benefit and decreed to convey the title to them. A judgment refusing to declare such a trust, and awarding the lot to Riddle, was affirmed by the Supreme Court of Oklahoma (41 Oklahoma, 759), and the case is brought here, under § 237, Jud. Code, upon the ground that the decision was against rights set up by plaintiffs in error under the provisions of the Agreement.

The facts are as follows: Some years prior to the making of the Agreement, one Fitzpatrick, a white man not entitled to citizenship in any Indian tribe, made a lease of the lot in controversy, then vacant and unimproved, to one Barnhart, who went into possession and erected a substantial house and other improvements, which were to belong to him, subject to the payment of a ground rent to Fitzpatrick. There is nothing to show what right Fitzpatrick claimed or that in fact he had any right to seize upon vacant tribal lands and contract concerning them as he did. In the year 1897, Barnhart sold the improvements and transferred the possession of the lot to one Ellis, who entered into possession and made further improvements. About April 1, 1898, Ellis refused to pay rent, and on July 7, in the same year, Fitzpatrick brought a suit for unlawful detainer against him in the United States Court, alleging, in an amended complaint filed in February, 1899, that he desired possession for the purpose of being able to place upon the lot such improvements as would protect his right to the land under the provisions of the Agreement. Fitzpatrick prevailed in the United States Court, and, on appeal, in the Court of Appeals for the Indian Territory (*Ellis* v. *Fitzpatrick*, 3 Ind. Ter. 656; 64 S. W. Rep. 567), and also in the Circuit Court of Appeals for the Eighth Circuit, whose decision was rendered October 27, 1902 (118 Fed. Rep. 430; 55 C. C. A. 260).

Meanwhile Ellis retained possession by means of a super-
sedeas bond.

In February, 1902, the Townsite Commission for 'the
Chickasaw Nation, organized pursuant to the provisions
of the Atoka Agreement, visited Chickasha for the purpose
of appraising town lots and awarding them to persons
having the preferential right to purchase under the terms
of the Agreement. Ellis having conveyed his rights to
Riddle and Cook, the lot was scheduled to them, and on
June 12, 1902, they were notified that they had the right
to purchase it. A week later they availed themselves of
this right by paying to the United States Indian Agent
the proper percentage of the appraised value to make up
the full purchase price of the lot, and took from him a
proper receipt.

Pending the unlawful detainer suit, Fitzpatrick con-
veyed whatever interest he had in the lot to a Mrs. Cross,
and she conveyed an undivided half interest to one Bour-
land. In January, 1903, after the decision of the Circuit
Court of Appeals, Bourland and Cross obtained possession
of the lot with the improvements, and in the following
month the present action of ejectment was commenced
by Riddle and Cook against Fitzpatrick and the persons
in possession. Thereafter Bourland and Cross conveyed
their interest to E. B. and H. B. Johnson, the present
plaintiffs in error, and they were substituted as defend-
ants. Riddle bought the interest of Cook, and thus be-
came the sole plaintiff. Pending the action, a contest was
instituted, either by Bourland and Cross or by the John-
sons, against Riddle and Cook, concerning the award
and scheduling of the lot to the latter. The townsite
commission having been abolished by the Secretary of the
Interior pursuant to Act of March 3, 1905, ch. 1479; 33
Stat. 1048, 1059; the contest was heard before the United
States Indian Inspector assigned to the Indian Territory,
upon whom this duty was imposed by regulations ap-

proved by the Secretary. Rep. Ind. Inspec., 1905, pp. 5, 22, 23; House Doc. No. 5, 59th Cong., 1st Sess., vol. 19, pp. 705, 722, 723. The Inspector made full findings of fact, and in an elaborate opinion decided in favor of contestees. Upon appeal this decision was affirmed by the Commissioner of Indian Affairs, and upon appeal to the Secretary of the Interior it was again affirmed. These decisions proceeded upon findings to the effect that at the time of the ratification of the Atoka Agreement and at the time the townsite of Chickasha was laid out by the Townsite Commission, and when the plats prepared by the Commission were finally approved by the Secretary of the Interior, Ellis was the owner of permanent, substantial, and valuable improvements, other than fences, tillage, and temporary houses, on said lot; that none of these improvements was in any way in issue in the unlawful detainer suit, and Ellis' ownership of them was not denied or disputed, but on the contrary was admitted by Fitzpatrick in his pleadings, and they were in no way adjudicated upon in that suit; that Riddle and Cook afterwards purchased the improvements from Ellis, and having received notice from the Townsite Commission, as already mentioned, of their right to purchase the lot under the provisions of the Atoka Agreement, they forwarded to the United States Indian Agent the proper percentage of the appraisement to make up the full purchase price of the lot, and received his receipt for the same. After the final determination of the contest before the Department of the Interior, a patent was issued to Riddle and his associate, dated in May, 1907.

The Atoka Agreement between the United States and the Choctaw and Chickasaw tribes, negotiated April 23, 1897, amended by § 29 of the Curtis Act (June 28, 1898, ch. 517, 30 Stat. 495, 505), and thereby submitted for ratification by the members of the tribes, was ratified by a majority of votes at a special election held on August 24,

1898, the result of which was ascertained and proclaimed on August 30th by a board of commissioners for that purpose designated by the Act, and the Agreement thus became effective. (See 6th Ann: Rep. Dawes Comm., September 1, 1899, House Doc. No. 5, 56th Cong., 1st Sess., Vol. 19, p. 9; Homer's Const. and Laws of Chickasaw Nation, 1899, p. 420.) It contains provisions respecting townsites (30 Stat. 508), of which the pertinent portions are set forth in the margin.[1]

Regulatory provisions, embodied in an Act of May 31,

---

[1] "Town Sites. It is further agreed that there shall be appointed a commission for each of the two nations. . . . Each of said commissions shall lay out town sites, to be restricted as far as possible to their present limits, where towns are now located in the nation for which said commission is appointed. . . . When said towns are so laid out, each lot on which permanent, substantial and valuable improvements, other than fences, tillage, and temporary houses, have been made, shall be valued by the commission provided for the nation in which the town is located at the price a fee-simple title to the same would bring in the market at the time the valuation is made, but not to include in such value the improvements thereon. The owner of the improvements on each lot shall have the right to buy one residence and one business lot at fifty per centum of the appraised value of such improved property, and the remainder of such improved property at sixty-two and one-half per centum of the said market value within sixty days from date of notice served on him that such lot is for sale, and if he purchases the same he shall, within ten days from his purchase, pay into the treasury of the United States one-fourth of the purchase price, and the balance in three equal annual installments, and when the entire sum is paid shall be entitled to a patent for the same. . . . If such owner of the improvements on any lot fails within sixty days to purchase and make the first payment on same, such lot, with the improvements thereon, shall be sold at public auction to the highest bidder, under the direction of the aforesaid commission, and the purchaser at such sale shall pay to the owner of the improvements the price for which said lot shall be sold, less sixty-two and one-half per cent. of said appraised value of the lot, and shall pay the sixty-two and one-half per cent. of said appraised value into the United States Treasury. . . . All lots not so appraised shall be sold from time to time at public auction. . . ."

1900 (ch. 598; 31 Stat. 221, 237, 238), were assented to
by the Choctaws and Chickasaws in the supplemental
agreement (Act of July 1, 1902, ch. 1362; 32 Stat. 641,
652), and other regulations were thereby added. Author-
ity to appraise town lots, improved or unimproved, to
ascertain the ownership and value of the improvements,
and to dispose of the lots in conformity to the provisions
of the Agreement, was thereby conferred upon the town-
site commission, subject to the supervision of the Secre-
tary of the Interior. (See *Ross* v. *Stewart,* 227 U. S. 530,
534.) Their unfinished duties were devolved upon the
Secretary by the Act of 1905, under whose authority the
Indian Inspector acted as already shown. The Supreme
Court of Oklahoma therefore was correct in holding that
the findings of the Inspector respecting matters of fact,
affirmed on final appeal by the Secretary, were binding
upon the courts, in the absence of gross mistake or fraud
(neither of which is here present), and that the judicial
inquiry is limited to determining whether there was clear
error of law that resulted in awarding the preferential right
of purchase, and ultimately issuing the patent, to the
wrong party. *Johnson* v. *Towsley,* 13 Wall. 72, 85; *Shep-
ley* v. *Cowan,* 91 U. S. 330, 340; *Marquez* v. *Frisbie,* 101
U. S. 473, 476; *Gonzales* v. *French,* 164 U. S. 338, 342;
*Ross* v. *Day,* 232 U. S. 110, 116.

Since the findings are to the effect that the improve-
ments upon the lot were owned by Ellis, and by defend-
ant in error through a purchase from him, the contentions
of plaintiffs in error are reduced to these: that the deci-
sion of the Indian Inspector, approved by the Secretary of
the Interior, to the effect that the Atoka Agreement ter-
minated the relation of landlord and tenant, was based
upon an erroneous construction of the Agreement, and
ignored the equities of the landlord as against the tenant;
that under a correct construction of the provision per-
mitting the owner of the improvements to buy a town lot

at a fraction of the appraised value, a tenant who wrongfully withheld possession of such a lot from his landlord, thereby preventing him from erecting improvements thereon, could not acquire title to the lot as against the landlord; and that a tenant who, under the provisions of the Agreement, but in violation of the rights of his landlord, has acquired a deed for such a lot, holds the title as trustee for the landlord.

The Atoka Agreement of course is to be read in the light of the conditions out of which it arose. The Choctaw Indians acquired the territory in question under a treaty with the United States made at Dancing Rabbit Creek in the year 1830, Sept. 27 (7 Stat. 333). In accordance with the provisions of the treaty, and pursuant to authority conferred by Act of May 28, 1830 (ch. 148, § 3, 4 Stat. 411, 412), a patent was issued by the President of the United States, March 23, 1842, granting the land to the Choctaw Nation, "in fee simple to them and their descendants, to inure to them, while they shall exist as a nation and live on it, liable to no transfer or alienation, except to the United States, or with their consent." (Durant's Const. & Laws of Choctaw Nation, 1894, p. 31.) In 1837 the Choctaws entered into a treaty with the Chickasaws, by which the latter were privileged to form a district within the limits of the Choctaw country, "to be held on the same terms that the Choctaws now hold it, except the right of disposing of it, which is held in common with the Choctaws and Chickasaws." This received the approval of the President and Senate of the United States. January 17, 1837, 11 Stat. 573, 575. In the year 1855 a new treaty was made between the United States and these tribes (June 22, 1855, 11 Stat. 611), by which the boundaries of their country were defined and the United States guaranteed the lands embraced within the specified limits "to the members of the Choctaw and Chickasaw tribes, their heirs and successors, to be held in common; so that

each and every member of either tribe shall have an equal,
undivided interest in the whole; *Provided, however*, no
part thereof shall ever be sold without the consent of both
tribes; and that said land shall revert to the United States
if said Indians and their heirs become extinct, or abandon
the same." The westerly part of the country was estab-
lished as a district for the Chickasaws, the easterly part
for the Choctaws. After the Civil War, and in the year
1866, a new treaty was made, by the eleventh article of
which it was recited that the land described in the treaty of
1855 "is now held by the members of said nations in com-
mon, under the provisions of the said treaty." April 28,
1866, 14 Stat. 769, 774. A plan for a survey, division, and
allotment of the land was proposed by the same article,
but this came to naught because of the non-assent of the
Choctaw people. *Woodward* v. *deGraffenried*, 238 U. S.
284, 294. Thus matters remained until, in the course of
time, the influx of white people into this and other parts
of the Indian Territory created a new situation of great
complexity, calling for a readjustment of the affairs of the
Five Civilized Tribes. In 1893 the Dawes Commission
was appointed, under authority of an act of Congress
(March 3, 1893, ch. 209, § 16, 27 Stat. 612, 645), to enter
into negotiations with those tribes for the purpose of ex-
tinguishing the tribal titles to lands. The annual reports
of the Commission, a reference list of which is printed in
238 U. S. 296, give a complete and instructive account of
its labors. The first of these reports, dated November 20,
1894, shows that among the original propositions sub-
mitted to the several tribes as a basis of negotiations it
was suggested that townsites should be the subject of
special agreements, such as would secure to the Indians
and to investors "a just protection and adjustment of
their respective rights." In explanation it was stated:
"There are towns in the Territory ranging in population
from a few people to 5,000 inhabitants, Nearly all of

them are noncitizens. . . . Many large and valuable
stone, brick, and wooden buildings have been erected by
noncitizens of these towns, and the lots on which they
stand are worth many thousands of dollars. These town
sites are not susceptible of division among the Indians,
and the only practicable method of adjusting the equities
between the tribes who own the sites and those who con-
structed the buildings is to appraise the lots without the
improvements and the improvements without the lots,
and allow the owners of the improvements to purchase
the lots at the appraised value, or to sell lot and im-
provements and divide the money according to the ap-
praisement." House Ex. Doc., Part 5, 53d Cong., 3d Sess.,
Vol. 14, pp. lxii, lxv.

The first agreement to be negotiated by the Commission
was with the Choctaws under date December 18, 1896,
but the Chickasaws refused to concur in this, and another
was negotiated at Atoka, April 23, 1897, with both tribes.
In its original form it is appended to the Fourth Report of
the Commission, dated October 11, 1897 (House Doc. No.
5, 55th Cong., 2d Sess., Vol. 12, pp. cxvii, cxxii). It pro-
vided that a townsite commission should be appointed for
each of the two nations; that each existing town site should
be laid out and platted, and that "each lot, on which
permanent, substantial and valuable improvements, other
than fences, tillage, and temporary houses, have been
made, shall be valued by the commission . . . at the
price a fee simple title to the same would bring in the mar-
ket at the time the valuation is made, but not to include
in such value the improvements thereon. The owner of
the improvements on each lot shall have the right to buy
the same at sixty-two and one-half per cent. of the said
market value, within sixty days from date of notice served
on him that such lot is for sale." It further provided that
if the owner of the improvements should fail to purchase,
the lot with improvements should be sold at auction, the

purchaser to pay the price to the owner of the improve-
ments, less sixty-two and one-half per cent. of the ap-
praised value of the lot, which was to be paid into the
United States Treasury for the benefit of the Indians.
This agreement, with some amendments, was ratified by
Congress in § 29 of the Curtis Act and afterwards ratified
by the voters of the two tribes, as already mentioned.
The provision as to purchase of town lots was amended
only by giving to the owner of the improvements the right
to buy one residence and one business lot at fifty per
centum, and the remainder of such improved property at
sixty-two and one-half per centum, of the appraised
market value.

The same Act contained, in its fifteenth section (June 28,
1898, c. 517, 30 Stat. 495, 500) a provision for the appoint-
ment of a townsite commission for each of the Chickasaw,
Choctaw, Creek, and Cherokee tribes; allowing "the
owner of the improvements upon any town lot, other than
fencing, tillage, or temporary buildings," to deposit in the
United States Treasury one-half of the appraised value of
the lot excluding improvements, as a tender to the tribe
of the purchase money for the lot; and permitting im-
proved lots to be sold at auction if the owner of the im-
provements thereon failed to deposit the purchase-money
within a limited time, in which case the purchaser at
auction might by appropriate proceedings in the United
States Court require the owner of the improvements to
either accept their appraised value or remove the improve-
ments from the lot. The same section provided for the
sale of unimproved lots, the purchase-money to be de-
posited with like effect as in the case of improved lots; and
authorized the tribes to make deeds to the purchasers
conveying the title to such town lots, whereupon the
purchase-money was to become the property of the tribe.
These provisions would appear to have been superseded,
as to the Choctaw and Chickasaw tribes, by their accept-

ance of the Atoka Agreement, and are mentioned only to show that in § 15, as in the Agreement, it was the owner of the improvements, and he alone, who was recognized as entitled to be considered in the sale of the town lots.

It is not necessary to say that the Agreement, when thus ratified by Congress and by the tribes, became the law of the land, and superseded all customs, if such there were, that had sanctioned the making of leases to non-citizens. By its terms towns, so far as they had been established within the domain of the tribes, were recognized, and provision was made for platting them, and for selling the lots, both improved and unimproved, the proceeds to become the property of the tribes. It was recognized that the money expended by white men in constructing the buildings and other permanent improvements had increased the value not only of the improved lots but of all lands within the town; and hence a preferential right of purchase was conferred upon "the owner of the improvements on each lot." But there is nothing in the history of the matter, any more than in the language employed, to give the least countenance to the suggestion that prior rights of occupancy were intended to be recognized in this Agreement. Ownership of improvements actually upon the soil was adopted as the sole foundation of the newly conferred right to acquire title to the soil itself. And these improvements must be "permanent, substantial, and valuable improvements, other than fences, tillage, and temporary houses." The exclusion of these latter, indicative merely of occupancy, is highly significant.

The provisions of the Agreement respecting the sale of town lots could not be carried into effect without terminating existing rights of occupancy, if such there were, saving as these coincided with the ownership of permanent improvements. Hence, if Fitzpatrick had any right to the soil, it came to an end either when the Agreement took effect in August, 1898, or, at latest, when its townsite pro-

visions were put in operation at Chickasha. It is insisted
that Ellis, as tenant, was estopped to deny his landlord's
title, and that Riddle is in no better case. *Blight's Lessee*
v. *Rochester,* 7 Wheat. 535, 547., But a tenant is not
estopped to show that his landlord's title has expired or
has been terminated by operation of law. *England* v.
*Slade,* 4 T. R. 682; *Blake* v. *Foster,* 8 T. R. 487; *Neave*
v. *Moss,* 1 Bing. 360; *Hopcraft* v. *Keys,* 9 Bing. 613; *Doe d.*
*Higginbotham* v. *Barton,* 11 Ad. & El. 307; *Den ex dem.*
*Howell* v. *Ashmore,* 22 N. J. L. 261, 265; *Shields* v. *Lozear,*
34 N. J. L. 496, 500; *Hilbourn* v. *Fogg,* 99 Massachusetts,
11; *Lamson* v. *Clarkson,* 113 Massachusetts, 348.

The argument that Ellis, by withholding possession of
the lot from Fitzpatrick, prevented him from erecting
improvements such as would have satisfied the require-
ments of the Atoka Agreement so as to confer upon Fitz-
patrick the preferential right to purchase the lot, and
hence that Ellis and those claiming under him are es-
topped to purchase the land for themselves and must be
held to have acquired it in trust for Fitzpatrick and those
claiming under him, cannot prevail. The facts do not
show that Ellis' refusal to pay rent, and his resistance
to the forcible entry and detainer suit, were other than
*bona fide.* Nor does it appear that Fitzpatrick, even
before the Atoka Agreement, had any right of possession
of the land as against the Indians. So far as the facts ap-
pear, he had no rights at all, except as against the tenant,
and against him only because of the estoppel. In order
to show that the tenant, by withholding possession, de-
prived the landlord of the opportunity of exercising a
valuable right, it must be made to appear that, with the
tenant out of the way, the right would have existed. But,
if Ellis had given up possession, Fitzpatrick would have
had no more right than any other white man to enter and
erect improvements—that is to say, none at all. At most,
he would have had a mere opportunity, without right,

and the deprivation of this cannot furnish a foundation for impressing a trust upon the title afterwards acquired by Ellis' grantee by direct purchase from the owners of the paramount title. Even were it made to appear that there was error in adjudging the title to the patentee, this would not raise a trust in favor of the contestant unless he could show that by the law, properly administered, the title ought to have been awarded to him. *Bohall* v. *Dilla,* 114 U. S. 47, 51; *Sparks* v. *Pierce,* 115 U. S. 408, 413.

What, then, was the nature of Fitzpatrick's equity? Under the facts found, both he and Ellis were trespassers upon the lands of the Indians, in disregard of rights secured to the latter by treaty with the United States, and in violation of § 2118, Rev. Stat. The lease created a mere estoppel between trespassers. The rights, if they may be called rights, of lessor and lessee alike were terminated by the force of the Agreement. Individual ownership of the land originated with that instrument, and can be only such as by its terms were created. It was competent for Congress, or for the Indian tribes, with the concurrence of Congress, to deal as they deemed proper with the practical situation resulting from the building of towns by white men within their borders. They chose to confer a preferential right of purchase, at a discount from the appraised value, not upon the "occupant," or "possessor," or "landlord," or "tenant," but upon "the owner of the improvements" other than those of a temporary nature. This did not cut off any pertinent equity, but it rendered all equities impertinent except such as related to the ownership of the improvements.

The Atoka Agreement, while accepting existing improvements of a substantial nature as part consideration for the purchase of town lots, contained no recognition of legitimacy in the previous occupation of the soil by white men, nor any official ratification of their intrusion upon the Indian lands. It laid aside, as immaterial, the question

whether improvements had been constructed with or without rightful possession of the land. In this respect it differed from the Original Creek Agreement of March 8, 1900 (Act of March 1, 1901, ch. 676; 31 Stat. 861, 866), the proposed Cherokee agreement of April 9, 1900 (Act of March 1, 1901, ch. 675; 31 Stat. 848, 853), which failed of ratification by the tribe (8th Ann. Rep. Dawes Comm., Oct. 1, 1901; House Doc. No. 5, 57th Cong., 1st Sess., Vol. 24, p. 11), and the Cherokee agreement of July 1, 1902 (ch. 1375; 32 Stat. 716, 723), which was ratified by the tribe (10th Ann. Rep. Dawes Comm., Sept. 30, 1903; House Doc. No. 5, 58th Cong., 2d Sess., Vol. 20, p. 115).

If Fitzpatrick had had any equitable right or interest in the improvements upon the lot in controversy, a very different question would be presented. But he had none.

We are referred to two decisions of the United States Court of Appeals for the Indian Territory that are said to uphold the legal validity of grants of leasehold interests in lands in the Choctaw and Chickasaw country prior to the Atoka Agreement. *Kelly* v. *Johnson* (1897), 1 Ind. Ter. 184, 189; 39 S. W. Rep. 352, 354; *G. W. Walker Trading Co.* v. *Grady Trading Co.* (1897), 1 Ind. Ter. 191, 196–198; 39 S. W. Rep. 354, 356. These cases, however, go no further than to hold that a possessory right might pass by transfer from a citizen of one of the Indian tribes to a non-citizen, and would protect the latter against forcible entry by others not showing a better right to the possession, nor acting under authority of the tribe, and that a lease of such lands with improvements estopped the lessee to question the lessor's title. See, also, *Wilson* v. *Owens* (1897), 1 Ind. Ter. 163; 38 S. W. Rep. 976; affirmed, 86 Fed. Rep. 571; *Hockett* v. *Alston*, 110 Fed. Rep. 910, reversing *S. C.*, 3 Ind. Ter. 432; 58 S. W. Rep. 675; *Williams* v. *Works*, 4 Ind. Ter. 587; 76 S. W. Rep. 246; *Fraer* v. *Washington*, 125 Fed. Rep. 280. These decisions leave untouched the authority of Congress, with

or without the consent of the tribe, to terminate all possessory interests and dispose of the fee in any manner deemed proper.

Much reliance is placed upon the decision of this court in *Rector* v. *Gibbon*, 111 U. S. 276, which turned upon the effect of an act of Congress in relation to the Hot Springs Reservation in the State of Arkansas (Act of March 3, 1877, ch. 108; 19 Stat. 377). The statute was passed to relieve the peculiar hardship resulting from a decision of the Court of Claims, affirmed by this court (*Hot Springs Cases*, 92 U. S. 698, 713, 715, 716), holding invalid, for reasons more or less technical, certain land titles set up against the United States, some of them under claims of preëmption and one under a New Madrid location, followed in each case by long years of possession. *Rector* v. *Gibbon* construed the legislation in the light of the circumstances out of which it arose, and so as to relieve those who had made improvements or claimed possession under the titles that had been found defective. It has no proper bearing upon the questions presented in the case at bar. *Lamb* v. *Davenport*, 18 Wall. 307; *Atherton* v. *Fowler*, 96 U. S. 513; and *Trenouth* v. *San Francisco*, 100 U. S. 251; cited by plaintiffs in error, are likewise aside from the point.

It is, perhaps, unnecessary to mention that the matter at issue here is not concluded by the decision in *Ellis* v. *Fitzpatrick*, 3 Ind. Ter. 656; 64 S. W. Rep. 567; *S. C.,* affirmed 118 Fed. Rep. 430; 55 C. C. A. 260; for that case concerned only the right of possession as between landlord and tenant, and Ellis' ownership of the improvements was admitted in the pleadings. The legal or equitable title to the soil was not involved.

From the views above expressed, it results that the judgment of the Supreme Court of Oklahoma must be
*Affirmed.*