## HARNAGE ET AL. *v.* MARTIN ET AL.

### ERROR TO THE SUPREME COURT OF THE STATE OF OKLAHOMA.

No. 112.　Argued December 19, 1916.—Decided January 8, 1917.

Of two qualified applicants for an allotment under § 11 of the Cherokee Agreement of 1902 (Act of July 1, 1902, c. 1375, 32 Stat. 716), the one owning the improvements on the tract in question, though junior in time of application, is entitled to prevail.

In such case a substantial equity in the improvements will suffice to hold the tract against a claimant whose interest in them is *nil.*

A decision of the Secretary of the Interior that one of two contesting claimants of an allotment under § 11 of the Cherokee Agreement, *supra,* was the owner of the improvements on the land, is conclusive, unless made without evidence to support it or otherwise the result of an error of law.

Where a community of interest in the possession and improvements of a tract of land existed among several members of a Cherokee family, an agreement among them that one should have a specific part of the land for her allotment, *held,* operative to pass an interest in the improvements on that parcel sufficient to give a preferential right to select it under § 11 of the Cherokee Agreement of 1902.

Section 18 of the Cherokee Agreement of 1902 recognized in terms the right of a tribal member to hold possession by his agent as well as by himself of land not exceeding the allottable quantity.

Certain proceedings before the Commissioner to the Five Civilized Tribes, and others in the United States Court for the Indian Territory, for the sale of the improvements upon the allotment here in

question, *held*, ineffectual against one who was not a party to those proceedings and who made application for the allotment, based on ownership of the improvements, before they were instituted.

40 Oklahoma, 341, affirmed.

THE case is stated in the opinion.

*Mr. James A. Veasey*, with whom *Mr. Lloyd A. Rowland* and *Mr. Jere P. O'Meara* were on the briefs, for plaintiffs in error.

*Mr. Robert J. Boone*, with whom *Mr. W. L. McKenzie* was on the briefs, for defendants in error.

MR. JUSTICE PITNEY delivered the opinion of the court.

This was an equity action involving the right to an allotment of land in the Cherokee Nation, containing about 77 acres. The plaintiff in error Harnage, and the defendant in error Martin, are members of the Cherokee Tribe, and rival claimants to the allotment. The other parties are two oil companies that claim under Harnage and Martin respectively, and admittedly have no higher rights than theirs. Harnage brought an action in one of the district courts of Oklahoma for the purpose of charging the legal title to the lands in question, which stood in Mrs. Martin, with a trust in his favor, upon the ground that the Secretary of the Interior, through a gross misapprehension of the facts or an error of law, had awarded the land to her, when under the provisions of the Cherokee Agreement and other acts of Congress pertaining to the subject it should have been awarded to him.

By the Agreement (Act of July 1, 1902, c. 1375, 32 Stat. 716, 717) it was provided as follows:

"Sec. 11. There shall be allotted by the Commission to the Five Civilized Tribes and to each citizen of the Cherokee tribe, . . . land equal in value to one hundred and ten acres of the average allottable lands of

the Cherokee Nation, to conform as nearly as may be to the areas and boundaries established by the Government survey, which land may be selected by each allottee so as to include his improvements.

*       *       *       *       *       *       *       *

"Sec. 18. It shall be unlawful after ninety days after the ratification of this Act by the Cherokees for any member of the Cherokee tribe to inclose or hold possession of, in any manner, by himself or through another, directly or indirectly, more lands in value than that of one hundred and ten acres of average allottable lands of the Cherokee Nation, either for himself or for his wife, or for each of his minor children, if members of said tribe; and any member of said tribe found in such possession of lands, or having the same in any manner inclosed, after the expiration of ninety days after the date of the ratification of this Act shall be deemed guilty of a misdemeanor."

By §§ 74 and 75 (p. 727) the act was to take effect upon ratification by a majority of the legal voters of the Nation. It was thus ratified on August 7, 1902.

On May 13, 1904, Harnage made application to the Dawes Commission to have the land in controversy allotted to him, and his application was granted. Thirteen days later Mrs. Martin made a similar application, and this was refused on the ground of the prior allotment to Harnage; thereupon she instituted a contest before the Commission against the Harnage allotment. It came to trial before the Dawes Commissioner in September, 1907, and resulted in a decision in favor of Mrs. Martin. Harnage appealed to the Commissioner of Indian Affairs, who rendered a like decision, and this, on appeal to the Secretary of the Interior, was affirmed; and deeds for the land in contest were made to Mrs. Martin pursuant to the act.

Upon the trial of the equity case plaintiffs in error introduced a certified transcript of all proceedings and evidence in the contest proceeding, and this was the only

evidence offered that was at all pertinent to the question we have to decide. Defendants in error demurred to the evidence, and the demurrer was sustained and the bill of complaint dismissed. This judgment was affirmed by the Supreme Court of Oklahoma. 40 Oklahoma, 341.

Harnage having admittedly filed first upon the land in controversy, Mrs. Martin was entitled to prevail in the contest only by showing that at the time of the Harnage filing she was the owner of the improvements, within the meaning of § 11 of the Agreement, and for that reason entitled under the provisions of the same section to take this particular land for her allotment. It was found by the Commissioner to the Five Civilized Tribes who heard the contest and by the Commissioner of Indian Affairs and the Secretary of the Interior who heard the successive appeals that Mrs. Martin was the owner of the improvements; and the only question for our determination is whether this decision was without evidence to support it or was otherwise the result of some error of law on the part of those officers. *Ross* v. *Stewart*, 227 U. S. 530, 535; *Ross* v. *Day*, 232 U. S. 110, 117; *Johnson* v. *Riddle*, 240 U. S. 467, 474.

Each of the departmental decisions was made in writing, but the findings are somewhat informal, each appeal having resulted in adding something to what had been found before,—a fact not surprising since the testimony is very voluminous, occupying more than 500 pages of the printed transcript in this court. The following is an outline of the facts found: Mrs. Martin was the granddaughter of an Indian woman known as Mary Anderson, or Anson, afterwards Mary Thursday, and was the daughter of William Bob Anson, otherwise known as Wild Bill. She had a brother known as Sam Bob. All these parties were Delaware Indians, adopted into the Cherokee Tribe, and as such were entitled to certain Delaware payments from the Government. During Mrs. Martin's childhood she and

her brother and their parents resided with the grand-mother, who was the head of the family, upon an improved tract of land known as the "old home place," located south and west of the land in controversy. Wild Bill died in 1889, and his wife about the same time; and, after this, such payments as were due to Wild Bill as a Delaware were paid to Mary Thursday, and also certain small payments that were due to the contestant. About the year 1891 contestant, then a child of about ten years, was removed by force or undue influence to the home of a Delaware named Frenchman, and kept there until the Delaware payments of 1891 and 1893, averaging over $500 each, were paid to the members of the tribe. The payments due to contestant were collected by Frenchman, who appropriated them to his own use, this having been his object in assuming control over the child. Later she was sent away to school at the expense of the Government, and afterwards returned to the vicinity of her home, where she supported herself by her labor. In November, 1898, when she was about eighteen years of age, she was married to George Martin, and shortly after this she and her husband visited Mary Thursday, and the latter then ascertained that contestant had not secured any land for future allotment. (This was after the establishment of the Dawes Commission, and after the passage of the Curtis Act of June 28, 1898 [c. 517, § 11, 30 Stat. 495–497] when the allotment of the Indian lands in the then Territory was in contemplation; *Woodward* v. *DeGraffenried,* 238 U. S. 284, 291.) During contestant's absence the original home place had been added to by the purchase in 1893 of the improvements on about 90 acres of land lying immediately north of it for $800, the purchase price having been paid by Mary Thursday and Sam Bob from the proceeds of the Delaware payments, and the bill of sale for the improvements having been made to them. The entire place then comprised about 200 acres of improvements. Mrs.

Thursday, recognizing an indebtedness to contestant on account of having received Delaware payments due to her and to her father, and there being sufficient land for herself and Sam Bob and contestant, gave to contestant a right to select the land in controversy, or at least to take as an allotment some portion of the home place, with the understanding that she, Mary Thursday, would hold it until the time for allotment, which was done. From the time of the making of this arrangement Mrs. Martin was recognized by her grandmother and her brother as having an interest in the place, that is, a right to share in the improvements to the extent necessary to entitle her to an allotment out of the land, notwithstanding her involuntary absence from home during her childhood. It was contended that Mary Thursday, at the time of the transaction referred to, was of unsound mind, but this was overruled as unsupported by the evidence.

It appears that before Mrs. Martin filed her allotment selection Mrs. Thursday had located her own allotment in the southern part of the home place, and Sam Bob had located his in the northern part, and the land lying between these was left for Mrs. Martin. This, in view of the previous agreement of Mrs. Thursday, was found to be equivalent to a transfer to Mrs. Martin of the specific improvements upon the intervening tract. The Department found that after the northern and southern portions of the farm were merged into one place there was a recognized community of interest among the members of the family growing out of their relationship and the commingling of their funds, whereby Mrs. Martin had an interest in every part of the family holdings, and that when Sam Bob elected to take his allotment in the northern part of the place and Mary Thursday to take hers in the southern part, they impliedly relinquished to the contestant as the remaining member of the family their interest in the tract of land lying between.

An agreement that Mrs. Martin should have a part of
the Thursday place for her allotment might fairly be held
to be equivalent to giving her a sufficient interest in the
improvements to support a preferential right to the allot-
ment, for by Cherokee law ownership of improvements
entitled the owner to possession of the land; and in § 11
of the Curtis Act there was a proviso "that whenever it
shall appear that any member of a tribe is in possession
of lands, his allotment may be made out of the lands in
his possession, including his home if the holder so desires."
The same general policy was afterwards carried into § 11
of the Cherokee Agreement, with more particular recog-
nition of ownership of the improvements as the decisive
point.

The contention that the findings were unsupported by
evidence cannot be sustained. The evidence is to some
extent circumstantial, but it is sufficient. It was con-
tradicted by Wallace Thursday, the husband of Mary,
but his unreliability was clearly shown.

It is argued that under § 18 of the Agreement, Mrs.
Thursday's possession, after November 5 of that year (90
days after date of ratification), of all lands in excess of the
value of 110 acres of average allottable lands for herself
and a like amount for each of her minor children, if any,
was unlawful, and that because Mrs. Martin reached the
age of twenty-one before the ratification of the Agreement
Mrs. Thursday could not lawfully hold for her any part
of the surplus lands. This is based upon a clear misinter-
pretation of § 18, the very terms of which permitted Mrs.
Martin, as a member of the Cherokee Tribe, to hold pos-
session, by herself or "through another," of lands not
exceeding in value 110 acres of average allottable lands,
and thus authorized her to hold the lands by her grand-
mother as her agent.

There is no question that the improvements upon the
allotment in question, as well as upon the adjoining lands,

were substantial in value, and were such as under the tribal law carried a right of occupancy, and such as were recognized in § 11 of the Curtis Act and § 11 of the Agreement. There is nothing inconsistent with the policy of the latter act in giving to Mrs. Martin, as owner of a substantial equitable interest in the improvements that were upon the tract in question when the act was passed, a preferential right to select that as her allotment. The policy was to give recognition to the established laws and customs of the Cherokees (Const. Art. I, § 2; Laws, 1892, §§ 706, 761, 762), under which citizens of the Nation might and did enclose and improve portions of their common domain and thereby establish a prior right to the possession of those lands, transferable to another citizen by a sale of the improvements. The Agreement substituted a system of allotments with ownership of the soil in the place of a mere possessory right, and its provisions were intended to limit the quantity of land that might be held by or for a single citizen, but they recognized the superior equity of an owner of improvements over that of a citizen who had no such ownership, and the precise character of the ownership was of little consequence as against a party having none at all.

Among the records that were introduced in evidence in the equity suit was an application made in the year 1905 to the Commissioner to the Five Civilized Tribes by Wallace Thursday, acting as guardian of the person and estate of Sam Bob, a minor, and of Mary Thursday, an insane person, for the sale of the improvements upon the allotment in controversy as surplus holdings of those Indians, and certain orders made in the same year by the United States Court for the Northern District of the Indian Territory upon the application of Wallace Thursday authorizing him in the same capacity to sell the improvements to Harnage. But as Mrs. Martin was not a party to these proceedings, and they were taken long after

the filing of her application for allotment, they can have no effect as against her.

Since we are convinced that the decision of the Supreme Court of Oklahoma deprived plaintiffs in error of no right to which they were entitled under the laws of the United States, it results that the judgment must be and it is

*Affirmed.*