Whitaker, Judge,
delivered the opinion of the court:
The plaintiff sues the defendant for the difference between the sale price of its town lots, which were sold by a commission appointed by the Secretary of the Interior, and what it alleges was the “true value” thereof.
Prior to the passage of the Curtis Act, approved June 28, 1898 (30 Stat. 495), all land in the Creek Domain was owned by the tribe in common; but that Act provided for the allotment of certain portions of the land to the. individual members of the tribe and for the sale of the remainder. Among the lands to be sold were lots in the towns within its territory. Section 15 of the Act provided for a commission to appraise and sell these lots. It was provided that the *608 commission should be composed of one member of the tribe-in question, to be appointed by the executive of the tribe, one member to be appointed by the Secretary of the-Interior, and one member to be selected by the town.
A commission for the town of Muskogee was appointed' pursuant to this Act, consisting of Dwight W. Tuttle, John Quincy Adams, and Benjamin F. Marshall, the latter being-the appointee of the executive of the tribe. A similar commission was appointed for the town of Wagoner. In due-course they proceeded to appraise the lots in these two-towns.
Before the lots were sold the plaintiff and the defendant entered into an agreement known as the Original. Creek Agreement, ratified by Congress and approved by the President on March 1, 1901 (31 Stat. 861), and ratified by the Creek Nation on May 25, 1901, and proclaimed by the President on June 28,1901. This agreement also provided for the-sale of lots within the towns. Its provisions for the appointment of commissions were similar to those of the Curtis. Act, except that they provided for their appointment by the Secretary of the Interior, one of whom was required to be a citizen of the tribe, to be nominated by the Principal Chief of the tribe.
Upon the passage of this Act the Secretary of the Interior-appointed the same commissions for the towns of Muskogee- and Wagoner previously appointed under the Curtis Act,, and he later appointed commissioners for the other towns-within the Creek territory.
Upon the reappointment of the commissions for Muskogee- and Wagoner they adopted their appraisals formerly made-under the Curtis Act, and in due course reported them to-the Secretary of the Interior, and they were approved by him. The commissioners appointed for the other Creek town-sites made their appraisals in due course and reported them to the Secretary of the Interior, and their appraisals were-approved by him.
It is alleged that these appraisals were arbitrary, fictitious, unreasonable, and made without any attempt to fix true values of the lots, and were far below the true value» *609 thereof. This, it is alleged, constituted a taking of plaintiff’s property by the defendant, for which it is required by the Fifth Amendment of the Constitution to pay just compensation ; or, if this be not true, it is alleged that the appraisals and their subsequent approval by the Secretary of the Interior were a violation of the Creek Agreement, for which the defendant is liable to respond to plaintiff for the loss suffered thereby.
The Agreement required the Secretary of the Interior to appoint townsite commissions, and required the commissions to appraise and sell the town lots under his supervision. It is necessarily to bo implied that the Secretary was obligated to act in good faith in the appointment of these commissioners, and that the commissioners were obligated to act in good faith in appraising and selling the lots, and if either the Secretary or the commissioners in the discharge of their duties perpetrated a fraud on plaintiff’s rights, or were guilty of gross negligence in the discharge of their duties, the defendant is liable in damages therefor. See Chippewa Indians of Minnesota v. United States, 91 C. Cls. 97; Ross v. Stewart, 227 U. S. 530, 535; Johnson v. Riddle, 240 U. S. 467, 474.
In Ross v. Stewart, supra, the court said of the action of these townsite commissions:
All reasonable presumptions must be indulged in support of the action of the officers to whom the law entrusted the proceedings * * *.
In Johnson v. Riddle, supra, in which was attacked the validity of the act of the townsite commission in awarding the right to purchase a lot to one of two rival claimants, the Supreme Court said:
* * * The Supreme Court of Oklahoma therefore was correct in holding that the findings of the Inspector respecting matters of fact, affirmed on final appeal by the Secretary, were binding upon the courts, in the absence of gross mistake or fraud (neither of which is here present), and that the judicial inquiry is limited to determining whether there was clear error of law that resulted in awarding the preferential right of purchase, and ultimately issuing the patent, to the wrong-party.
*610 The question for our determination, therefore, is whether or not these townsite commissions were guilty of fraud or made such a gross mistake as would justify us in setting aside their action and ourselves determining the value of these townsites.
It must be said at the outset that it would take the most clear and convincing evidence to induce us, especially at this time, forty years later, to set aside the findings of these commissioners, and ourselves undertake to fix the value of these lots. The Creek Agreement provided for the appraisal of these lots by the commission, and not by us. It was expressly provided:
* * * The agreement of any two members of the commission as to the true value of any lot shall constitute a determination thereof, subject to the approval of the Secretary of the Interior, and if no two members are able to agree, the matter shall be determined by such Secretary. [Italics ours.]
The commissions for Muskogee and Wagoner appointed under the Curtis Act were composed of a representative of the town, a member of the tribe, and an appointee of the Secretary of the Interior. These commissions were continued under the Creek Agreement. On the other commissions there was a representative of the tribe. All the representatives of the tribe agreed to the appraisals; the appraisals were unanimous. ' In addition, they were approved, first, by the Inspector for the Five Civilized Tribes, then by the Commissioner of Indian Affairs, and finally by the Secretary of the Interior. The Principal Chief of the tribe without complaint signed deeds to the lots purchased on the basis of the appraisals.
The tribe itself had never complained that these appraisals were too low until this suit was filed. The tribe did complain that many lots had been wrongfully scheduled, but it has never asserted that they were undervalued. See .the Act of the Creek Nation of October 12, 1904, and the memorial of October 19, 1906. (The Act authorized the commissions to make a schedule of the persons who had made permanent improvements on the lots and, therefore, *611 who were entitled under the Act to purchase such lots at one-half of their appraised value.)
In pursuance of the above-mentioned Act of the Creek Nation, and of this memorial by the Creek Nation, Congress passed an Act (3é Stat. 137, 144) authorizing the bringing of suits for the benefit of the Creek Nation “for the collection of any moneys or recovery of any land claimed by any of said tribes.” Two hundred thirty-one suits were filed, but all of them were filed for wrongful scheduling of the lots, and none on account of undervaluation thereof. So far as is known, the first complaint that has ever been registered for undervaluation of these lots by the townsite commissions was registered when this suit was instituted — thirty years after the appraisals were made.
Under these circumstances, it would take proof of the' strongest character to make us conclude that there was either fraud or gross error in these valuations. The proof offered by the plaintiff fails to convince us of either. It complains, first, that the townsite commissions for Muskogee and Wagoner appointed under the Creek Agreement adopted the appraisals made by them under the Curtis Act a year before; but the plaintiff does not show that values had increased in the meantime! It cites several instances where the appraisals by the townsite commissions were considerably below the assessments for taxation a year or so later; but it does not show that values were the same. It points to instances where the vacant lots were sold at auction a year or so later for sums more than twice the amount of the appraisals; but again it does not show that values had not increased. The same is true of reports of estimates of values by the school superintendent as compared with the appraisals.
This is the extent of plaintiff’s proof to show fraud or gross mistake. It is practically all inadmissible, since there is no showing that conditions were the same.
Although there is á large disparity in some of the figures, yet it must be remembered that prior to the time the townsite commissions made their valuations there had been nio market for the lots, because the lots could not be sold. *612 It was an extremely difficult thing for anyone to say just what these lots would bring when they were put on the market. At the time the appraisals were made no improvements had been made in any of the towns. The Indian Inspector for the Five Civilized Tribes stated in his testimony that none of them had been incorporated, none had any water or sewers, or street pavements, or sidewalks, or any modern conveniences ; that the streets in the dry season were very dusty, and in the wet season were practically impassible. These lots were assessed for taxation by the town authorities apparently after incorporation, and, for all that appears, after improvements had been made or were in prospect. The assessments for tax purposes apparently included not only the value of the lots, but the improvements thereon. The appraisals of the townsite commissions related only to the value of the land.
The proof shows that oil was discovered in the vicinity of some of the towns, at any rate, in the interim between the appraisals by-the townsite commissions and the assessment for taxation.
The record indicates that the appraisals were low, but we are by no means convinced that they were fraudulent, or that such gross mistake was made as to justify us in setting aside the appraisals made, and to undertake now, forty years later, to determine what the true values were. If there had been fraud or gross mistake, complaint thereof would have been made long before, as was done in the matter of scheduling. Mere disparity between appraisal and subsequent sale price does not show fraud or gross mistake. Appraisals are made by sworn officers and are accepted as prima facie correct. To overcome such appraisals, clear and convincing evidence of fraud or gross mistake must be shown. As stated, the record fails to disclose that any event had happened which might have changed values. Often appraisals are higher than subsequent' sale prices. The reverse is also true. Fraud cannot be assumed. It must be proved by clear and convincing evidence. There is no such evidence in the record.
Moreover, the proof offered is wholly insufficient to enable us to fix the true values of these lots at the time of the *613 appraisals, even if we'were convinced that fraud had been practiced or gross mistake had been made.
We are of the opinion that the plaintiff is not entitled to recover. Its petition, therefore, will be dismissed. It is so ordered.
MaddeN, Judge; Jones, Judge; Littleton, Judge; and Whaley, Chief Justice, concur.