## UNITED STATES v. APPLE et al.

(Circuit Court of Appeals, Eighth Circuit. September 13, 1923.)

No. 6333.

1. **Appeal and error** ⊂⇒1018—**Findings of master not reviewable under stipulation, when supported by evidence.**

Where the parties stipulated that a special master should be appointed to take the testimony and make findings of fact and conclusions of law, his findings cannot be disturbed, when supported by substantial evidence and not manifestly erroneous.

2. **Appeal and error** ⊂⇒1018—**Correctness of conclusions of law determined from findings of fact.**

When master's findings of fact were supported by substantial evidence and could not be disturbed, the correctness of conclusions of law are to be determined from such findings, and not from a claimed true state of facts different from the facts so found.

3. **Attorney and client** ⊂⇒153—**Attorney representing adverse parties held precluded from recovering on the contract.**

Where an attorney, under employment to perform all legal business of certain persons, appeared for defendants in a suit brought by such persons, he broke the contract, and could not recover on the contract for services; no claim being made on quantum meruit.

Appeal from the District Court of the United States for the District of Kansas; John C. Pollock, Judge.

Suit by the United States against Walter T. Apple and others. From a decree for defendants, plaintiff appeals. Modified and affirmed.

See, also, 262 Fed. 200.

Leslie J. Lyons, Sp. Asst. Atty. Gen., for appellant.

E. S. Bessey, of Oklahoma City, Okl. (A. M. Keene, of Ft. Scott, Kan., Edward E. Sapp, of Galena, Kan., and George W. Earnshaw, of Joplin, Mo., on the briefs), for appellees.

Before STONE and KENYON, Circuit Judges, and TRIEBER, District Judge.

KENYON, Circuit Judge. This case is here on appeal from the District Court of the United States for the District of Kansas. The government brought action against a number of defendants to recover sums of money claimed to belong to Benjamin and See-sah Quapaw, full-blood Quapaw Indians, living on the Quapaw Reservation in Ottawa county, Okl., upon whose land rich deposits of lead and zinc ore had been discovered. In March, 1920, See-sah Quapaw died, and her husband and brother were determined by the Secretary of the Interior to be her heirs. Said action sought an accounting from various parties

defendant for money acquired from Benjamin Quapaw, also to declare trusts for portions of said money invested, and to cancel certain bonds, mortgages, notes, and powers of attorney, and other contracts signed by Benjamin and See-sah Quapaw. As the case was originally brought, there were 23 defendants, and 9 parties filed interventions. Certain compromises and adjustments were made between the government, acting in behalf of the Indians, various defendants, and all of the interveners, except one. This eliminated many parties, and as the' case was finally tried there were 6 defendants and 1 intervener. The defendants were Walter T. Apple, Edward E. Sapp, Charles Goodeagle, Merton Goodeagle, Baxter National Bank of Baxter Springs, Kan., and First National Bank of Miami, Okl. The intervener was Smith, Rae & Lovitt.

[1] The record is voluminous and many questions are presented by the assignments of error. Our power to review the evidence is challenged by reason of the agreement made between the parties for the appointment of a master providing as follows:

### "Stipulation for Appointment of Master, etc.

"It is stipulated and agreed, by and between the undersigned solicitors for the respective parties, that a special master shall be appointed in the above entitled cause in accordance with the equity rules and be governed by the same, to take the testimony, make findings of fact and conclusions of law as to the rights of the respective parties, under the directions of the court."

Under this agreement W. P. Dillard was appointed special master, and made 51 findings of fact and 15 conclusions of law. In view of the agreement entered into between the parties for the appointment of a special master, and the appointment in pursuance thereof by the court, to make findings of fact and conclusions of law, we are prevented under the holdings of the Supreme Court of the United States from reviewing these conclusions of fact if there is substantial evidence to support them.

In Davis v. Schwartz, 155 U. S. 631, 636, 15 Sup. Ct. 237, 239 (39 L. Ed. 289), the court said:

"1. As the case was referred by the court to a master to report, not the evidence merely, but the facts of the case, and his conclusions of law thereon, we think that his finding, so far as it involves questions of fact, is attended by a presumption of correctness similar to that in the case of a finding by a referee, the special verdict of a jury, the findings of a Circuit Court in a case tried by the court under Rev. Stat. § 649, or in an admiralty cause appealed to this court. In neither of these cases is the finding absolutely conclusive, as if there be no testimony tending to support it; but so far as it depends upon conflicting testimony, or upon the credibility of witnesses, or so far as there is any testimony consistent with the finding, it must be treated as unassailable."

In Kimberly v. Arms, 129 U. S. 512, 524, 9 Sup. Ct. 355, 359 (32 L. Ed. 764), the court said:

"It is not within the general province of a master to pass upon all the issues in an equity case, nor is it competent for the court to refer the entire decision of a case to him without the consent of the parties. It cannot, of its own motion, or upon the request of one party, abdicate its duty to determine by its own judgment the controversy presented, and devolve that duty upon any of its officers. But when the parties consent to the reference of a

case to a master or other officer to hear and decide all the issues therein, and report his findings, both of fact and of law, and such reference is entered as a rule of the court, the master is clothed with very different powers from those which he exercises upon ordinary references, without such consent; and his determinations are not subject to be set aside and disregarded at the mere discretion of the court. A reference by consent of parties, of an entire case for the determination of all its issues, though not strictly a submission of the controversy to arbitration—a proceeding which is governed by special rules—is a submission of the controversy to a tribunal of the parties' own selection, to be governed in its conduct by the ordinary rules applicable to the administration of justice in tribunals established by law. Its findings, like those of an independent tribunal, are to be taken as presumptively correct, subject, indeed, to be reviewed under the reservation contained in the consent and order of the court, when there has been manifest error in the consideration given to the evidence, or in the application of the law, but not otherwise."

This case draws a distinction between the usual reference by the court to a master, and a reference by consent of parties of an entire case for the determination of all its issues. Courts should not abdicate their functions and powers in favor of the master, but where parties agree that the master shall determine and make findings of fact, and the master makes such findings, it is in the interest of justice that great weight be accorded them, and if there is substantial evidence in their support and they are not manifestly erroneous they will be sustained. Crawford v. Neal, 144 U. S. 585, 12 Sup. Ct. 759, 36 L. Ed. 552.

It is pressed in argument that the case of City and County of Denver et al. v. Denver Union Water Co., 246 U. S. 178, 38 Sup. Ct. 278, 62 L. Ed. 649, modifies the rule of Kimberly v. Arms and Davis v. Schwartz. We do not think so. The consent to the order of reference was different in that case from the case at bar, as is apparent from the following quotation therefrom:

"In the present case, the consent given to the order of reference was conditioned by the terms of the order itself, which, as we have seen, limited the functions of the master to the taking of testimony and reporting it to the court together with his findings of fact and conclusions of law for the advisement of the court."

In United States Trust Co. v. Mercantile Trust Co. et al., 88 Fed. 140, 153, 31 C. C. A. 427, 440, the court stated the rule:

"So far, therefore, as the findings of fact by the special master, under the stipulation referred to, are based upon conflicting evidence, or upon the veracity of witnesses, or so far as there is evidence consistent with the finding, they are conclusive and binding upon the court."

In the case of Blank v. Aronson, 109 C. C. A. 327, 330, 187 Fed. 241, 244, this court stated the rule thus:

"It is the settled law of this court that, where a chancellor has considered conflicting evidence and made his findings of fact and decree thereon, they will be treated as presumptively correct, and will not be disturbed, unless an obvious error has intervened in the application of the law, or some serious mistake has been made in the consideration of the evidence."

Other federal cases on this subject are Cimiotti Unhairing Co. v. American Fur Refining Co., 168 Fed. 529, 93 C. C. A. 546; Chicago, M. & St. P. Ry. Co. v. Clark, 92 Fed. 968, 35 C. C. A. 120; Arkansas Anthracite Coal & Land Co. v. Stokes (C. C. A.) 277 Fed. 625; Lacy

v. McCafferty, 215 Fed. 352, 131 C. C. A. 494; Hathaway et al. v.
Ford Motor Co. (C. C. A.) 264 Fed. 952; Hamilton & Sons Co. et al.
v. Moss-Jellico Coal Co. (C. C. A.) 271 Fed. 237; Aronstam v. All-
Russian Central Union of Consumers' Societies, Inc. (C. C. A.) 270
Fed. 460.

The fatality of the government's position is the limitation placed
upon our right to review the facts by the decisions cited, notably Davis
v. Schwartz, 155 U. S. 631, 15 Sup. Ct. 237, 39 L. Ed. 289, and Kim-
berly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764.

Some members of this court would not have reached the same con-
clusion as the master upon the facts, and would favor setting aside
some of the master's findings, were it not for the rule laid down by the
Supreme Court of the United States before referred to. That there
was substantial evidence to support the master's findings is apparent
by a perusal of the record. The District Court likewise so found and
said in its opinion:

"It is therefore considered, both on the findings of the special master,
abundantly supported by proofs, that Benjamin Quapaw was in fact compe-
tent to deal with his property rights, and, considering the further fact, that
as a matter of law he had been so determined by the government, which
determination was unquestioned at the date of the contracts by him made,
sought to be set aside in this suit, I am of the opinion these contracts must
be upheld as found by the master, and the exceptions taken to the report of
the special master are overruled and denied, and a decree will enter in
accordance therewith."

We feel compelled therefore to accept the findings of fact made by
the master, agreed to and indorsed by the District Judge.

We may say, however, that the record in this case shows a plunder-
ing of Benjamin Quapaw shocking to those who have been accustomed
to regard the Indians as wards of the government and not the legitimate
prey of grafters. In 1914 rich lead and zinc deposits were found on
his allotment and royalties commenced to pour in. Before the govern-
ment stepped in to stop the orgy of plunder, approximately $178,000
of Benjamin Quapaw's money had disappeared. He was involved in
all kinds of liability on notes and contracts, the building of hotels,
garages, and a useless refinery. Had the government not come to his
aid, it is apparent from the evidence that within a short time he would
have had nothing left except his post office address. The certain man
who the Scriptures tell us went down from Jerusalem to Jericho and
fell among thieves had a mild financial experience compared with that
of Benjamin Quapaw. So intolerable was the situation that on Decem-
ber 30, 1917, Mr. Deaver, superintendent of the Quapaw Agency, sent
a telegram to the authorities at Washington as follows:

"Urgent that Benjamin and See-sah Quapaw and Wat-tah-noh-zhe (Good-
eagle) non-English speaking Quapaw Indians be declared incompetent to pro-
tect them from grafters who have layed (laid) plans to secure more than
$20,000.00 royalties due in a few days. Have investigated and if protection
is not given at once, this sum will be lost to them. [Then follows description
of real estate.] [Signed] Deaver, Sup't."

Charles Goodeagle, an untrustworthy Indian friend, seems to have
been the first party to secure a contract and power of attorney from
Quapaw. He successfully muddled his business affairs, and under

his management thousands of dollars of Quapaw's money disappeared. Naturally Quapaw was anxious to get rid of Charles Goodeagle, but seemed unable to do so. A meeting was held at Judge Sapp's office at Galena, Kan., at which were present Benjamin Quapaw, Francis Goodeagle, and others for the purpose of straightening out his affairs. It would seem the first thing to have done would have been to end the business relationship with Charles Goodeagle, who had been so successful in dissipating Quapaw's royalties. However, from this meeting came, not a dissolution of the business arrangement between Benjamin Quapaw and Charles Goodeagle, but new contracts under the terms of which the same Charles Goodeagle was to receive $250 per month for looking after Benjamin Quapaw's matters; W. T. Apple $200 per month for assisting Goodeagle to manage the garage and hotel business, and for advising him in any business matters which he might have for Benjamin and See-sah Quapaw, his wife; and a third contract with Edward E. Sapp, whereby he was to act as attorney for Benjamin and See-sah Quapaw and look after their business affairs in Ottawa, Okl., and Cherokee county, Kan., he to receive $5,000 per year for a period of two years. The master in his forty-fifth finding of fact states, referring to the contracts with Charles Goodeagle and the contract with Sapp, that:

" * * * These contracts were neither unfair nor inequitable, and do not, of themselves, show any fraud on or overreaching of Benjamin Quapaw. It is queer that, after the experience which they had had with Charles Goodeagle as manager and adviser, they should reappoint him their attorney in fact; but this is fully explained by the testimony of Sapp, who says that he suggested Merton Goodeagle in the place of Charles Goodeagle, and that objection was made by Francis Goodeagle, upon the ground that Merton had married a Pottawatomie, and by the further fact that in the new power of attorney it was provided that all checks thereafter made by Charles Goodeagle should be O. K.'d by W. T. Apple."

The master's use of the word "queer" is rather a mild characterization of this situation. However, bound as we are by the rule of Davis v. Schwartz and Kimberly v. Arms, heretofore cited, there is no object to be attained in discussing the evidence. We turn, therefore, to the conclusions of law.

[2, 3] The exceptions to the conclusions of law all refer to what should have been the conclusions under the "true state of facts." The true state of facts, as the government contends, is different from the findings of the master. The difficulty with this position is that the true state of facts, as far as the decision of this case is concerned, is as found by the master, and his conclusions of fact, supported as they are by substantial evidence, are the facts upon which we must determine the correctness of the conclusions of law. We cannot say that the conclusions of law, as drawn by the master upon his findings of fact, and approved by the District Court, are erroneous, except as to the twelfth conclusion, and that we cannot pass by. It is as follows:

"That defendant E. E. Sapp is entitled to a judgment and decree against the plaintiffs, to be paid out of any money in their hands belonging to Benjamin Quapaw, for $2,262, with interest at the rate of 6 per cent. per annum from June 14, 1918."

He limited the right of recovery to June 14, 1918, for the following reasons, as stated by him:

"  *   *   *   On June 12, 1918, there was filed in this court a bill in equity by Benjamin and See-sah Quapaw as plaintiffs against Francis Goodeagle, Merton Goodeagle, Walter T. Apple, the American National Bank of Baxter Springs, Kan., and other defendants, the object and purpose of which bill was very similar to that of the bill of the plaintiffs in this case. The suit in that cause was begun for the plaintiffs by Hiram W. Currey, one of the solicitors who appeared at the hearing before the master herein on behalf of the plaintiffs, and whose name is signed to the brief filed by them. This suit of Quapaw and wife v. Goodeagle et al., was not dismissed in this court until November 17, 1921. Although Judge Sapp was, at the time of the commencement of the last-mentioned suit, under contract to perform all of the legal business of Benjamin and See-sah Quapaw, he yet appeared and represented in that suit the defendants above named. The explanation possibly of this conduct on the part of Judge Sapp is in the fact that his clients had employed Mr. Currey to bring the suit for them. Be that as it may, I am of opinion that Judge Sapp should not be allowed compensation under the contract of November 14, 1917, for a time subsequent to the bringing of that suit by Benjamin and See-sah Quapaw, in which cause he appeared for parties interested adversely to them."

The finding, therefore, was for recovery for Judge Sapp upon the contract. That is the contention likewise of the brief filed in his behalf. No question of a quantum meruit is involved. The master found, and the court approved the finding, that Judge Sapp was employed under the contract to perform all the legal business of Benjamin and See-sah Quapaw, and that while so employed he appeared for defendants in a suit brought by Benjamin and See-sah Quapaw. That suit was to recover from those they alleged had wrongfully secured their property. Under that state of facts the conclusion of law should have been that the contract was breached by Sapp and that there could be no recovery thereon by him. The master recognized the impropriety of the situation, and did not allow recovery on the contract after the date that the attorney appeared for defendants in a case brought to protect his clients. That did not go far enough. The conclusion of the master allowing defendant Sapp the amount of $2,262 on the contract was erroneous, and the District Court erred in permitting it to stand.

The judgment and decree against Benjamin Quapaw is modified, by deducting therefrom the sum of $2,262, with interest at the rate of 6 per cent. per annum from June 14, 1918, allowed to Edward E. Sapp. Thus modified, the judgment and decree of the District Court is affirmed.