**HANSON v. HOFFMAN et al.**

No. 2011.

Circuit Court of Appeals, Tenth Circuit.

May 24, 1940.

Rehearing Denied July 13, 1940.

782

Dick Rice, of Miami, Okl., for appellant.

Vern E. Thompson, of Joplin, Mo. (Loyd E. Roberts and Thompson & Roberts, all of Joplin, Mo., and Byron B. Hoffman, of Miami, Okl., on the brief), for appellees.

Before PHILLIPS, BRATTON, and WILLIAMS, Circuit Judges.

PHILLIPS, Circuit Judge.

Lilia Quapaw Hanson brought this suit against Agnes Quapaw Hoffman, Jean Ann

Quapaw Hoffman, an infant, Henry E. Hoffman, as guardian of Jean Ann Quapaw Hoffman, and Henry E. Hoffman, individually. The defendants filed a motion to dismiss the suit. The trial court held that it was without jurisdiction over the subject matter, that there was an absence of indispensable parties defendant, and that the complaint failed to state a claim upon which relief could be granted against Hoffman individually, and entered its decree dismissing the suit. Lilia has appealed.

The complaint is involved and prolix. Interspersed therein are many statements of evidentiary facts as distinguished from ultimate facts, and many conclusions of law. We shall undertake to gather from the complaint, and state as we understand them, the ultimate facts upon which Lilia predicates her prayer for relief.

Each party to the action is a citizen of the state of Oklahoma. Lilia is a resident of the Eastern District of Oklahoma. The defendants are residents of Ottawa County, Oklahoma, in the Northern District of Oklahoma.

Benjamin Quapaw was a full-blood Quapaw Indian. About 1870 he married Lizzie Perryman, a Creek woman. Lilia was born about 1874, the lawful issue of that marriage. Four or five years later, Benjamin was divorced from Lizzie in accordance with Creek custom. Lizzie, in accordance with that custom, retained custody of Lilia. Thereafter, Benjamin married See-sah. Benjamin and See-sah each received Quapaw allotments and they inherited another Quapaw allotment from their deceased daughter, Hum-bah-wat-tah. In 1915, pursuant to the Act of June 7, 1897, 30 Stat. 62, 72, they entered into mining leases on their allotments and during the years 1915, 1916, and 1917, the lessee discovered and developed rich deposits of lead and zinc ore therein. From royalties reserved under such leases, they received the sum of $179,084. $172,710.94 thereof was deposited in the names of Benjamin and See-sah in the Baxter National Bank, at Baxter Springs, Kansas.

On May 2, 1917, Benjamin purchased with such funds a tract of land in Ottawa County, Oklahoma, referred to in the complaint as parcel No. 1. On February 12, 1917, March 19, 1917, and April 18, 1917, respectively, Benjamin purchased with such funds certain lots in Baxter Springs, Kansas. These lots are referred to in the complaint as parcel No. 2. He took deeds of conveyance for parcels 1 and 2 in his own name.

Between March, 1915, and December 31, 1917, Benjamin purchased with such funds certain other lots in Baxter Springs, Kansas. These are referred to in the complaint as parcel No. 3. The deeds of conveyance therefor were taken in the name of Charles Goodeagle.

On December 31, 1917, pursuant to the Act of Congress of June 7, 1897, § 1, 30 Stat. 62, 72, the Secretary of the Interior declared Benjamin and See-sah incompetent.

In 1919 a suit was commenced by the United States in behalf of Benjamin and See-sah against Walter T. Apple, Charles Goodeagle, and others to recover certain real estate and funds of Benjamin and See-sah. See United States v. Apple, D.C. Kan., 262 F. 200, and United States v. Apple, 8 Cir., 292 F. 935. Certain compromises and adjustments were entered into between the United States and certain of the defendants. See 292 F. 936.

On May 6, 1918, Charles Goodeagle executed and delivered a deed conveying to Franklin K. Lane, as Secretary of the Interior, and his successors in office, in trust for Benjamin and See-sah, the lands embraced in parcel No. 3. The deed contained the following provision:

"It being the intent and purpose of this deed that in the event of the death of either the said Benjamin Quapaw or See-sah Quapaw, the survivor of them shall, subject to the trust herein declared, succeed to the sole beneficial interest in said lands."

On October 6, 1920, Francis Goodeagle by deed, conveyed to John Barton Payne, Secretary of the Interior, in trust for Benjamin, certain lots in Baxter Springs, Kansas, referred to in the complaint as parcel No. 4.

On June 10, 1918, John I. Cooper held the legal title to a certain lot in Baxter Springs, Kansas, in trust for Benjamin, and on that date, conveyed the same to Franklin K. Lane, Secretary of the Interior, in trust for Benjamin and See-sah. It is referred to in the complaint as parcel No. 5. The deed contained a provision for survivorship substantially like the provision above quoted from the deed of May 6, 1918.

The Secretary of the Interior did not release the funds with which Benjamin ac-

quired parcels numbered 1, 2, 3, 4, and 5 upon condition that a clause imposing restrictions on alienation be inserted in the deeds conveying such land to Benjamin or to others for his benefit.

See-sah died intestate in Ottawa County, Oklahoma, in the year 1920, leaving surviving as her sole heir at law Benjamin.[1]

On January 4, 1921, Agnes went through a pretended civil marriage ceremony with Benjamin at Columbus, Cherokee County, Kansas, and because thereof claims to be the widow and heir at law of Benjamin. At the time of such pretended marriage, Agnes was a prepossessing Indian maiden about 20 years of age; she was educated and intelligent, and could speak both Quapaw and English; Benjamin was past 70 years of age, was infirm, and illiterate; he could not read, speak, nor understand the English language; he was mentally incapable of understanding or consenting to a marriage ceremony with Agnes, and did not understand, comprehend, nor consent to the marriage.

Section 23—120, R.S.Kan.1923, prohibits marriage by an imbecile or feeble-minded person to a woman under 45 years of age.

Prior to such marriage Benjamin had been declared incompetent by the Secretary of the Interior and incompetent in fact under the laws of Oklahoma by the county court of Ottawa County, Oklahoma, and at the time of such marriage had a regularly appointed, qualified, and acting guardian, both of his person and estate.

At the time of the death of See-sah, Mes-kah-tun-ka, mother of Agnes, saw Benjamin weeping and told him in Quapaw "Not to weep or take the death so hard for he could have her daughter, Agnes." Thereupon, Agnes devised a plan or scheme to acquire Benjamin's wealth and deprive Lilia thereof by a pretext of a lawful marriage with Benjamin. In furtherance of such scheme, on January 4, 1921, in Ottawa County, Oklahoma, Agnes and her mother and the latter's husband, Buck Slagle, a white man, inveigled Benjamin to accompany them by automobile to Columbus, Cherokee County, Kansas. On their arrival in Columbus, Agnes and the other members of the party took Benjamin to the court house. Agnes applied for a license to marry Benjamin. Agnes filled out the application for the license, stating under oath that her age was 23 years and Benjamin's was 43 years. Thereupon, the probate judge issued the marriage license to Agnes. The party then went to an adjoining room and Agnes ordered Benjamin to take his place by her side in front of the probate judge, who conducted a pretended ceremony in the English language, which Benjamin did not understand and could not comprehend.

On October 28, 1924, Benjamin pretending to act under the Act of February 14, 1913, 37 Stat. 678, 25 U.S.C.A. § 373, and regulations adopted and approved by the Secretary of the Interior on June 19, 1923, executed a pretended will by thumbprint, bequeathing and devising all his estate, real, personal, and mixed, to his wife, Agnes, and his daughter, Jean. Victor Griffin was the chief of the Quapaws; he married a sister of Agnes; he was educated in English schools and was mentally and physically strong and alert; he lived on the Quapaw Reservation and was a neighbor and had the confidence of Benjamin. On the morning of October 28, 1924, Agnes, in furtherance of her scheme to acquire Benjamin's wealth, drove to the home of Griffin and informed him that Benjamin wanted him to come to town to act as interpreter for his will; in the forenoon of October 28, 1924, Griffin met Agnes and Benjamin on the street in Miami; Griffin importuned, solicited, and directed Benjamin to convey all his property and estate by will to Agnes and Jean; Griffin stated to Benjamin that a man had told him Lilia and Lizzie Perryman were dead, and directed him to make his wife and child, meaning Agnes and Jean, the beneficiaries under the will. Benjamin, Agnes, and Griffin then went to a lawyer's office in Miami for the purpose of preparing the pretended will. Griffin and Agnes furnished the lawyer with the information and dictated the terms and provisions of the pretended will. Benjamin was of a confiding and yielding disposition and succumbed to the importunities, solicitations, and demands of Griffin and Agnes. Benjamin was mentally incapable of understanding or comprehending the nature and extent of his property. The will was not interpreted into the Quapaw language, and Benjamin did not understand nor comprehend it.

---

[1] In United States v. Apple, 8 Cir., 292 F. 935, it is stated that See-sah died in March, 1920, and that Benjamin and her brother were determined by the Secretary of the Interior to be her heirs.

Section 33 of the regulations of June 19, 1923, provides that the will of an Indian shall set forth the name, age, residence, and tribe of the Indian, the names, ages, and relationship of the devisees, a specific description of the trust or restricted lands disposed of, and a sufficient description of the personal property bequeathed, to enable the Indian office to identify it. The pretended will did not meet the foregoing requirements of the regulations.

Benjamin died on May 28, 1926. At the time of his death he was a resident of Ottawa County, Oklahoma. He died seized and possessed of the three restricted Quapaw allotments, royalties reserved under mining leases thereon. $463,252.96 in cash, $74,200 in Liberty Bonds, and $10,000 in United States Treasury Certificates held in trust by the United States for the benefit of Benjamin, and certain farming machinery and equipment, automobiles, cattle, horses, hogs, household furniture and fixtures, and other property located on his farm in Ottawa County, Oklahoma.

Benjamin also died seized and possessed of the legal title to parcels numbered 1 and 2 and, the equitable title to parcels numbered 3, 4, and 5.

Section 35 of the regulations of June 19, 1923, requires the Examiner of Inheritance, before submitting a will for approval, to inquire fully into the mental competency of the Indian, the circumstances attending the execution of the will, the influences which induced its execution, and the names of those entitled to share in the estate under the state law of descent. The Examiner did not inquire fully into the mental competency of Benjamin, did not examine the transcript of record in United States v. Apple, supra, which showed that Benjamin was incompetent in fact, but limited his inquiry to the testimony of three witnesses,—the lawyer who dictated the will to a stenographer, the stenographer who transcribed the dictation, and Griffin. The Examiner did not ascertain the names of those entitled to share in the estate under the state law of descent and distribution, ignored the testimony in United States v. Apple, wherein Benjamin testified that his first wife was a Creek woman and that he

had a child by her, a little girl, who might be alive, and the testimony of Francis Goodeagle that he went to the Creek Nation with Benjamin after the Civil War and Benjamin married a Creek woman and had a child by that marriage.[2] Two Indian witnesses testified before the Examiner that Benjamin had been married twice. Agnes testified that he had been married three times, twice before his marriage to her. The Examiner made full inquiry as to the children born of the second and third marriages, but made no inquiry as to the name of the first wife, whether she was living, whether there were any living issue born of the first marriage or descendants of deceased issue of the first marriage. Witnesses before the Examiner knew the facts respecting the first marriage of Benjamin and the birth of Lilia, the issue of that marriage, and could have testified to them had the Examiner made inquiry, and many other witnesses were available who could have testified to those facts. Agnes, Griffin, and John Quapaw had knowledge and information of the first marriage and the fact that a child was born of that marriage and failed. to disclose those facts to the Examiner.

There is endorsed upon the pretended will a certificate of the witness, Victor Griffin, in which he states he correctly interpreted the will to Benjamin. At the hearing before the Examiner, Griffin testified that he interpreted the will to Benjamin before the latter signed it. Griffin did not interpret the will other than to say, "Well, Uncle, they got everything wrote down there like you want it."

The Examiner transmitted a false, fictitious, misleading, and incomplete report of his investigation to the Commissioner of Indian Affairs with the recommendation that the will be approved. On March 10, 1927, the Commissioner of Indian Affairs transmitted the pretended will to the Secretary of the Interior, accompanied by a letter which contained the following false and misleading statements: That Benjamin was only married twice, first to See-sah and second to Agnes; that Benjamin died May 26, 1926, at the age of 69 years, and left surviving him as his only heirs, Agnes,

[2] In the trial of United States v. Apple, 262 F. 200, in the District Court of the United States for the District of Kansas, Benjamin and Francis Goodeagle testified that before Benjamin married See-sah he went to the Creek country and married a Creek woman, and that one child, a daughter, was born, the issue of that marriage. See transcript of record, pp. 246, 345, in United States v. Apple, 8 Cir., 292 F. 935.

his wife, and Jean, his daughter, and that, had he died intestate, they would have been entitled to inherit his estate in equal shares in accordance with the laws of descent and distribution in force at the time of his death; that the purported will was prepared and executed in the manner and form required by the regulations of the Department; that Benjamin, at the time of the execution of the pretended will, was of sound and disposing mind and memory; that there was no evidence of fraud, duress, or undue influence whereby the execution of the will was induced; and that the will was the result of the voluntary act of a normal mind, having full knowledge of the purport and meaning of the contents thereof.

The Secretary of the Interior believed and relied upon the representations made in the report of the Examiner and the letter from the Commissioner of Indian Affairs and was induced thereby to approve the will.

On March 14, 1927, the Assistant Secretary of the Interior approved the will "so far as it relates to property under control of the United States."

Lilia had no knowledge of the death of Benjamin until July, 1937, and no knowledge of the pretended will until November, 1937. Thereupon she immediately began an investigation respecting Benjamin's estate and discovered the matters and things of which she complains. In January, 1938, by written petition, she brought the foregoing facts with respect to the execution and approval of the will to the attention of the Secretary of the Interior, and requested him to withdraw his approval of such will and to ascertain, establish and declare the legal heirs of Benjamin. The Secretary of the Interior referred the petition to the Probate Division of the Department and on April 25, 1939, an Assistant Secretary of the Interior arbitrarily declined to hear evidence or take any action in the premises.

The Secretary of the Interior has never ascertained and determined, pursuant to section 1 of the Act of Congress of June 25, 1910, 36 Stat. 855, 25 U.S.C.A. § 372, the heirs at law of Benjamin, and no court under authority of state law has ever ascertained or determined the heirs at law of Benjamin.

Under the laws of descent and distribution in force and effect in the states of Oklahoma and Kansas at the date of the death of Benjamin, parcels numbered 1, 2, 3, 4, and 5, not being under the control of the United States, descended to Lilia and Jean, as the children and heirs at law of Benjamin, in equal shares, Agnes not being entitled to inherit because her pretended marriage to Benjamin is null and void.

Because of the foregoing facts, the pretended will is void and Benjamin died intestate. Lilia, under the laws of Kansas and Oklahoma, is entitled to succeed to an undivided one-half interest in all property, real, personal, and mixed, restricted or unrestricted, of which Benjamin died seized.

Even though such will be valid, under the provisions of § 11255, C.O.S.1921, § 1570, O.S.1931, 84 Okl.St.Ann. § 132, and § 22—243, R.S.Kan.1923, in force and effect at the date Benjamin executed such pretended will, Lilia, being absent and having been reported to be dead, and being unintentionally omitted, was a pretermitted child, and is entitled to inherit from Benjamin as she would have been entitled had he died intestate.

At the date of Benjamin's death the allotments were subject to certain mining leases entered into on October 16, 1922, under authority of the Act of Congress of March 3, 1921, § 26, 41 Stat. 1248, for a term ending March 3, 1946, reserving to Benjamin a ten per cent royalty. Since the year 1926 the royalties from such leases have exceeded $100,000 per year and have been paid to the Superintendent of the Quapaw Indian Agency at Miami, Oklahoma, and by him have been remitted to the Secretary of the Interior to be held in trust for the beneficiaries of the estate of Benjamin. The royalties so received and remitted to July 1, 1939, exceeded one and a half million dollars.

Henry E. Hoffman, husband of Agnes, and stepfather and guardian of Jean, falsely and fraudulently represented to the Secretary of the Interior that the pretended thumbprint will of Benjamin was legal and valid, and that Agnes and Jean, the legatees and devisees named in such will, are the heirs at law of Benjamin and would have been entitled to inherit his estate had he died intestate. The Secretary of the Interior relied upon and believed such representations to be true and was thereby prevailed upon and induced to remove the restrictions from and deliver to Agnes and Hoffman, as guardian of Jean, during the years 1927 to 1939, inclusive, more

than one million dollars of trust funds in the hands of the Secretary of the Interior, and Agnes and Hoffman, as guardian, hold an undivided one-half interest in such funds so released, freed of restrictions, in trust for Lilia.

Agnes and Jean, acting through her guardian Henry E. Hoffman, and the Secretary of the Interior have conveyed to purchasers certain property embraced in parcels numbered 3, 4, and 5. Lilia is the owner of an undivided one-half interest in and to such lands so conveyed, and Agnes, Jean, and Henry E. Hoffman, as guardian, hold an undivided one-half of the proceeds received therefor in trust for Lilia.

In her prayer for relief, Lilia seeks a decree adjudging that she is a daughter by blood and an heir at law of Benjamin Quapaw, deceased; that parcels numbered 1, 2, 3, 4, and 5 are unrestricted real estate; that Benjamin died intestate as to one-half of such real estate by virtue of the pretermitted child statutes of Oklahoma and Kansas; that the royalties, trust funds, bonds, moneys, and securities received by the defendants from or through the Secretary of the Interior and which accrued from the lands of which Benjamin died seized, are unrestricted funds in the hands of the defendants; that the moneys received by the defendants for the real estate conveyed by them to innocent purchasers are unrestricted moneys in the hands of the defendants; that the royalties, moneys, bonuses, rents, and profits received by Hoffman for mining privileges and rights upon or connected with the real estate of which Benjamin died seized are unrestricted funds and property in his hands, and that he holds the same in trust for Lilia and the other lawful heirs of Benjamin; that Lilia is the owner of an undivided one-half interest in parcels numbered 1, 2, 3, 4, and 5, and in the royalties, trust funds, bonds, moneys, and securities received by the defendants from the Secretary of the Interior and from the sale of such real estate, and by Hoffman for mining privileges and rights from real estate of which Benjamin died seized; that Benjamin was declared and determined to be legally incompetent, pursuant to the Act of Congress of March 3, 1921, § 26, 41 Stat. 1225, 1248; that he had neither power nor capacity to execute a will under the Act of February 14, 1913, 37 Stat. 678, 25 U.S.C.A. § 373; that he was mentally incompetent in fact at the date he undertook to make such pretended will; that such pretended will was procured by undue influence; that it was not made and executed as required by the Act of Congress of February 14, 1913, and the regulations of the Secretary of the Interior of June 19, 1923; that such will is null and void; that the approval of such will by the Secretary of the Interior was obtained by fraud; that the defendants hold in trust for Lilia an undivided one-half interest in all moneys, rents, royalties, bonds, stocks, and securities received by them from the Secretary of the Interior from moneys and property held in trust by the United States for Benjamin at the time of his death, or from royalties produced since his death from real estate of which he died seized; that the defendants hold in trust for Lilia an undivided one-half interest in all real and personal property held in the name of the defendants, or any of them, or in the name of any person for them, into which funds of which Benjamin died seized or arising from lands of which Benjamin died seized have been converted;

And cancelling and annulling the pretended marriage between Benjamin and Agnes and the documentary evidence thereof;

And requiring the defendants and each of them to make a full and complete disclosure and accounting of all moneys, royalties, rents, and income received directly or indirectly from mining rights in lands of which Benjamin died seized, and of all royalties, trust funds, bonds, and securities received by them and each of them by or through the Secretary of the Interior which belonged to Benjamin at the time of his death, or which accrued since the date of his death from lands of which he died seized, and directing Agnes to surrender to the court all evidence of such pretended marriage which she may have in her possession or under her control, including the marriage license and return thereof and the marriage certificate.

By the Act of March 2, 1895, § 1, 28 Stat. 876, 907, the allotments of land made to the Quapaw Indians by the Quapaw National Council were ratified and confirmed and the Secretary of the Interior was authorized to issue patents to the allottees. It provided, however, that such allotments should be inalienable for a period of 25 years from and after the date of patent.

By the Act of June 7, 1897, 30 Stat. 62, 72, Quapaw allottees were authorized to

788

lease their lands, or any part thereof, for a term of 10 years for mining purposes. It provided, however, that whenever it should be made to appear to the Secretary of the Interior that, by reason of age or disability, any such allottee could not improve or manage his allotment properly with benefit to himself, it might be leased by the Secretary upon such terms and conditions as he should prescribe. The trust period was extended as to Benjamin Quapaw and certain other named Indians by the Act of March 3, 1921, 41 Stat. 1225, 1248, for the further and additional period of 25 years.

The Act of February 14, 1913, 37 Stat. 678, 25 U.S.C.A. § 373, provides that any person who has attained the age of 21 years having an allotment held under trust or other patent containing restrictions on alienation or individual Indian moneys or other property held in trust by the United States shall have the right prior to the expiration of the trust or restrictive period, and before the issuance of a fee simple patent or the removal of restrictions, to dispose of such property by will, in accordance with regulations to be prescribed by the Secretary of the Interior. It further provides that such a will shall not be valid nor have any force or effect unless it shall have been approved by the Secretary of the Interior; that the Secretary may approve or disapprove the will either before or after the death of the testator; that where such a will has been approved and it is subsequently discovered that there was fraud in connection with the execution or procurement thereof, the Secretary of the Interior within one year after the death of the testator may cancel the approval of the will, and the property of the testator shall thereupon descend or be distributed in accordance with the laws of the state wherein the property is located; and that approval of the will and death of the testator shall not operate to terminate the trust or restrictive period, but the Secretary may, in his discretion, cause the lands to be sold and the money derived therefrom, or so much thereof as may be necessary, used for the benefit of the heir or heirs entitled thereto, remove the restrictions, cause patent in fee to be issued to the devisee or devisees, pay the moneys to the legatee or legatees either in whole or in part from time to time as he may deem advisable, or use it for their benefit.

The Act of March 3, 1921, provided that all lands allotted to or inherited by Quapaw Indians, when subject to restrictions against alienation, might be leased for mining purposes for such period and under such rules, regulations, terms, and conditions only as should be prescribed by the Secretary of the Interior.

Section 35 of the rules and regulations promulgated by the Secretary of the Interior thereunder provides:

"The examiner, superintendent, or other officer, before submitting a will, shall inquire fully into the mental competency of the Indian; the circumstances attending the execution of the will; the influences which induced its execution; and the names of those entitled to share in the estate under the state law of descent; and where the distribution proposed by the will is contrary to the laws of the state in which the testator resides, and the estate is disposed of in whole or in part to a person or persons who would not otherwise inherit, the best available evidence should be obtained as to the reasons for such action. If the testator is living, his own affidavit as to the reasons for disinheriting the natural or lawful heirs should be obtained. In the absence of some exceptionally good reason for contrary action, the department will require the testator to follow the law of the state in which he resides and where the property is located. The competency of all devisees and legatees to manage their own affairs should be investigated, and note should be made if any beneficiary under the will is a white person not of Indian blood. The examiner or superintendent in submitting the will of a deceased Indian should make a specific recommendation as to whether the will should be approved or disapproved by the Secretary."

The Act of June 25, 1910, § 1, 36 Stat. 855, as amended by the Act of March 3, 1928, 45 Stat. 161, and the Act of April 30, 1934, 48 Stat. 647, 25 U.S.C.A. § 372, provides that when any Indian to whom an allotment of land has been made, or hereafter may be made, dies before the expiration of the trust period and before the issuance of a fee simple patent, without having made a will disposing of said allotment, the Secretary, upon notice and hearing under such rules as he may prescribe, shall ascertain the legal heirs of such decedent, and his decision thereon shall be final and conclusive.

■ With respect to Indian wills falling within the purview of 25 U.S.C.A. § 373, supra, and approved thereunder, state law has no application. It is superseded by the Act of Congress and the rules and regulations promulgated by the Secretary thereunder. And Indians of the class defined in section 373, supra, have the right to dispose of their restricted and trust property by will thereunder, free from the limitations of state law, provided such wills are made and executed in accordance with the regulations and receive the approval of the Secretary of the Interior. [3]

■ Such wills need not be probated in a state court, but are to be approved or disapproved by the Secretary of the Interior and filed for record in the Department of the Interior. [4]

It will be observed that Lilia seeks relief with respect to the following classes of property:

(1) Lands (parcels numbered 1 and 2) which were purchased by Benjamin with funds received from royalties reserved under mining leases on restricted allotments, title to which was taken in Benjamin's name and was so held by him at the time of his death.

(2) Personal property located on the farm of Benjamin at the time of his death, over which the Secretary of the Interior has never exercised any administrative control.

(3) Funds paid over to the defendants by the Secretary of the Interior, freed from restrictions, out of restricted funds in the hands of the Secretary of the Interior derived from the restricted allotments of which Benjamin died seized, both before and after his death.

(4) Lands (parcels numbered 3, 4, and 5) which were acquired for Benjamin and See-sah with funds received from royalties reserved under mining leases on their restricted allotments, title to which was conveyed to the Secretary of the Interior and his successors in office in trust for Benjamin and See-sah, or the survivor thereof, and which were so held by the Secretary of the Interior in trust for Benjamin at the date of his death.

(5) Restricted allotments, and restricted funds derived therefrom both prior to and since the death of Benjamin now in the hands of the Secretary of the Interior.

The relief sought would only indirectly affect class 5 by adjudging the will to be invalid and setting aside the Secretary's approval thereof.

■ Counsel for Lilia asserts that the funds which were released by the Secretary of the Interior to Benjamin were freed of restrictions; that lands purchased therewith were free from restrictions; and that the Secretary was without power, even after adjudging Benjamin incompetent, to subject such funds or lands to a trust. But the Secretary of the Interior, by assuming the administration of such trust property, asserts the right so to do and his claim of right may not be challenged in an action to which neither the Secretary nor the United States is a party. Morrison v. Work, 266 U.S. 481, 486, 45 S.Ct. 149, 69 L.Ed. 394.

■ It will be observed that under 25 U.S.C.A. § 373, supra, the death of Benjamin and the approval of the will did not free the allotments from restrictions, nor terminate the trust respecting the properties held by the Secretary. The three allotments remained restricted and the moneys derived therefrom, both before and subsequently to the death of Benjamin, and the lands conveyed to the Secretary remained subject to the trust, and to administration and control by the Secretary.

■ The restricted property and trust funds still being under the administrative control of the Secretary of the Interior, there can be no doubt of the power of the Secretary to have set aside the approval of the will on the ground of fraud in the execution or procurement of the will within one year from the date of the death of Benjamin, and to set aside the approval at any time on the ground of lack of testamentary capacity, undue influence, or failure to comply with the rules and regulations in connection with the execution of the will, or on the ground of fraud, failure of subordinate officers to report the true facts to the Secretary, or other like grounds whereby approval of the will was induced. Lane v. U. S. ex

[3] Blanset v. Cardin, 256 U.S. 319, 326, 41 S.Ct. 519, 65 L.Ed. 950; Id., 8 Cir., 261 F. 309, 312, 313; Sperry Oil & Gas Co. v. Chisholm, 264 U.S. 488, 495, 44 S.Ct. 372, 68 L.Ed. 803. Cf. Blundell v. Wallace, 267 U.S. 373, 376, 377, 45 S. Ct. 247, 69 L.Ed. 664.

[4] Blanset v. Cardin, 8 Cir., 261 F. 309, 312.

rel. Mickadiet, 241 U.S. 201, 207–209, 36 S.Ct. 599, 60 L.Ed. 956; Nimrod v. Jandron, 58 App.D.C. 38, 24 F.2d 613.

And, so long as the allotments and trust property remained under the administrative control of the Secretary of the Interior, he had exclusive jurisdiction to reconsider and inquire into and set aside the approval of the will. Such right of review is the very essence of administrative authority. Lane v. U. S. ex rel. Mickadiet, supra, 241 U.S. page 209, 36 S.Ct. 599, 60 L. Ed. 956; Michigan Land & Lumber Co. v. Rust, 168 U.S. 589, 593-595, 18 S.Ct. 208, 42 L.Ed. 591. And until the administrative control of the Secretary over the allotments and the trust property has ceased, the courts are without power to interfere with the performance by the Secretary of his administrative functions with respect thereto. Lane v. U. S. ex rel. Mickadiet, supra, 241 U.S. pages 208, 209, 36 S.Ct. 599, 60 L.Ed. 956; McKay v. Kalyton, 204 U.S. 458, 468, 27 S.Ct. 346, 51 L.Ed. 566; Hy-Yu-Tse-Mil-Kin v. Smith, 194 U.S. 401, 408, 24 S.Ct. 676, 48 L.Ed. 1039.[5]

It follows that the District Court was without jurisdiction over the subject matter of classes 4 and 5, and the only relief open to Lilia with respect thereto is through resort to administrative review. Furthermore, a decree of the District Court adjudging the will null and void and setting aside the approval thereof would interfere with the control and administration of the Secretary of the Interior over classes 4 and 5. Neither the United States nor the Secretary of the Interior is made a party defendant. It follows that there is an absence of an indispensable party with respect to any relief sought that would affect classes 4 and 5. Morrison v. Work, 266 U.S. 481, 485, 486, 45 S.Ct. 149, 69 L.Ed. 394.

With respect to classes 1 and 2, over which the Secretary of the Interior has never assumed to exercise any administrative control, and with respect to class 3, which the Secretary has released to the defendants, freed from restrictions and administrative control, a different question is presented.

Section 373, supra, in part reads as follows:

"Any person of the age of twenty-one years having any right, title, or interest in any allotment held under trust or other patent containing restrictions on alienation or individual Indian moneys or other property held in trust by the United States shall have the right prior to the expiration of the trust or restrictive period, and before the issuance of a fee simple patent or the removal of restrictions, to dispose of such property by will, in accordance with regulations to be prescribed by the Secretary of the Interior * * * *."

The statute by its terms is limited to restricted and trust property. Furthermore, the approval of the will by the Secretary of the Interior was expressly limited to property under control of the United States.

It would seem, therefore, that Benjamin was free to dispose of classes 1 and 2 a any other citizen subject to the provisions of local law. See Hanson v. Hoffman, 150 Kan. 121, 91 P.2d 31, 34; Blundell v. Wallace, 267 U.S. 373, 376, 45 S.Ct. 247, 69 L.Ed. 664.

While Benjamin was a person to whom an allotment of land had been made, who died before the expiration of the trust period and before the issuance of a fee simple patent, he left a will disposing of his allotments, and the will has been approved by the Secretary of the Interior. Unless and until that approval is set aside, the Secretary does not have exclusive jurisdiction under the provisions of 25 U.S.C.A. § 372, supra, to ascertain the legal heirs of Benjamin. We conclude, therefore, that the trial court had power to determine and adjudge that Lilia was an heir at law of Benjamin and to decree the will to be ineffectual, on the ground of fraud, undue influence, and lack of testamentary capacity, with respect to classes 1 and 2.

With respect to class 3, so long as the legal title thereto remained in the Secretary of the Interior and the property remained subject to his administration and control, and within his quasi-judicial power, that power could not be controlled or restrained by judicial action.[6]

But the approval of the will by the Secretary of the Interior and the delivery of the funds freed of restrictions to the defendants vested the legal title in the defendants.

---

[5] The right given a claimant to an allotment to establish his title thereto in the proper District Court of the United States by the Act of August 15, 1894, 28 Stat. 305, 25 U.S.C.A. § 345, by its express terms is inapplicable to the Quapaws.

[6] Johnson v. Towsley, 13 Wall. 72, 87, 80 U.S. 72, 87, 20 L.Ed. 485.

and terminated the control and administration thereof by the Secretary. The question whether Lilia is entitled to equitable rights therein as against the defendants is one purely of private right.[7]

The legal title, having so vested through the administrative action of the Secretary, is not open to collateral attack.[8]

But courts of equity have power in a direct proceeding to inquire into and correct mistakes, injustice, and wrong in both judicial and executive action, however solemn the form which the result of that action may assume when it invades private rights,[9] and may determine whether, according to the established rules of equity and applicable law, the party holding that title should hold it absolutely as his own or as trustee for another.[10]

In such a proceeding plaintiff must plead and prove that the instrument was induced by fraud, that fraud was practiced upon the administrative officials, that they themselves were guilty of fraudulent practices, that they erred in the construction of the applicable law, or other grounds for equitable interference, and that such wrongful action induced the administrative officer to vest the title in the defendants, and that the plaintiff is equitably entitled thereto.[11]

The proceedings before the Secretary of the Interior being ex parte, it is not essential that the fraud be extrinsic.[12]

As a basis for jurisdiction it is alleged that this suit arises under and involves the construction and application of the Act of Congress of February 14, 1913, 37 Stat. 678, 25 U.S.C.A. § 373, the regulations adopted and approved thereunder by the Secretary of the Interior on June 19, 1923, the Act of March 2, 1895, 28 Stat. 907, the Act of March 3, 1921, 41 Stat. 1225, 1248, and the Act of Nov. 18, 1921, 42 Stat. 1570, and that the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $3000.

Counsel for defendants contend that classes 1 and 2, as well as classes 4 and 5, were under the control and administration of the Secretary of the Interior at the time of the death of Benjamin and at the time of the approval of the will. On the other hand, counsel for Lilia contends that classes 1 and 2 were vested in Benjamin at the time of his death free from administrative control by the Secretary. The answer to this question depends upon a construction of the Act of Congress of June 7, 1897, and the rules and regulations of the Secretary. Counsel for Lilia further contends that the will and the execution thereof failed to comply with the regulations of the Secretary of the Interior made pursuant to 25 U.S.C.A. § 373, supra, and that the subordinate officers in the Department of the Interior failed to follow such regulations in the proceedings for the approval of the will. It follows that the construction and effect of those regulations, which have the force and effect of law, are involved. For these reasons, we conclude that the suit is one arising under the laws of the United States and that the trial court had jurisdiction thereof.

The judgment below is reversed and the cause is remanded with instructions to enter an order dismissing the complaint in so far as it relates to classes 4 and 5, and in so far as it seeks a decree adjudging the will to be void and setting aside the approval thereof with respect to classes 3, 4, and 5, and

[7] Johnson v. Towsley, supra, 13 Wall. page 87, 20 L.Ed. 485.

[8] Steel v. Smelting Co., 106 U.S. 447, 451, 1 S.Ct. 389, 27 L.Ed. 226; St. Louis Smelting & Refining Co. v. Kemp, 104 U.S. 636, 647, 26 L.Ed. 875.

[9] Johnson v. Towsley, supra, 13 Wall. page 84, 20 L.Ed. 485; United States v. Mushunkashey, 10 Cir., 72 F.2d 847, 851, certiorari denied 294 U.S. 724, 55 S.Ct. 551, 79 L.Ed. 1255.

[10] Johnson v. Towsley, supra, 13 Wall. page 87, 20 L.Ed. 485.

[11] Gonzales v. French, 164 U.S. 338, 342, 17 S.Ct. 102, 41 L.Ed. 548; Marquez v. Frisbie, 101 U.S. 473, 476, 25 L. Ed. 800; Moore v. Robbins, 96 U.S. 530, 535, 24 L.Ed. 848; Monroe Cattle Co. v. Becker, 147 U.S. 47, 57, 13 S.Ct. 217, 37 L.Ed. 72; Turner v. Sawyer, 150 U. S. 578, 586, 14 S.Ct. 192, 37 L.Ed. 1189; Bockfinger v. Foster, 190 U.S. 116, 124, 23 S.Ct. 836, 47 L.Ed. 975; Frellsen & Co. v. Crandell, 217 U.S. 71, 78, 30 S. Ct. 490, 54 L.Ed. 670; Baldwin v. Stark, 107 U.S. 463, 465, 2 S.Ct. 473, 27 L.Ed. 526; Johnson v. Riddle, 240 U.S. 467, 474, 36 S.Ct. 393, 60 L.Ed. 752; Quinby v. Conlan, 104 U.S. 420, 426, 26 L.Ed. 800; Dixon v. Cox, 8 Cir., 268 F. 285, 289.

[12] Iowa Land & Trust Co. v. United States, 8 Cir., 217 F. 11, 15; McCaskill Co. v. United States, 216 U.S. 504, 508, 30 S.Ct. 386, 54 L.Ed. 590; Washington Securities Co. v. United States, 234 U.S. 76, 79, 34 S.Ct. 725, 58 L.Ed. 1220.

overruling the motion to dismiss in so far as it seeks relief with respect to classes 1, 2, and 3, and permitting Lilia to file an amended complaint in accordance with the views herein expressed.

The costs of this appeal will be assessed equally between the parties.

### On Petition for Rehearing.

In their petition for rehearing counsel for appellees assert that the court overlooked the general rule that a court of equity will not entertain jurisdiction of a bill in equity to set aside a will or the probate thereof.

In our original opinion we grouped the property involved into five classes. With respect to the property embraced in classes four and five, we adhered to the general rule.

With respect to the property in classes one and two, the rule has no application. 25 U.S.C.A. § 373 and the Rules of the Secretary of the Interior promulgated thereunder, pursuant to which the purported will was made, apply only to allotments held under trust or other patent containing restrictions on alienation, and individual Indian moneys or other property held in trust by the United States. See original opinion. And the approval of the will by the Secretary of the Interior was expressly limited to property under control of the United States. The will has neither been approved nor probated in so far as it undertook to dispose of property embraced in classes one and two. Appellees have never filed the will for probate either in the county court of Ottawa County, Oklahoma, or the probate court of Cherokee County, Kansas. It seems clear to us with respect to the property embraced in classes one and two that Lilia Quapaw Hanson has no adequate remedy except through a proceeding in equity.

With respect to class three, we held that the approval of the will by the Secretary of the Interior and the distribution of the property to appellees vested the legal title thereto in them. We did not hold that the court could set aside the approval by the Secretary of the Interior, but only that upon pleading and proof of recognized grounds for equitable interference, the court might adjudge that appellees held the legal title in trust for Lilia. It is clear that Lilia has no adequate remedy with respect to the property embraced in class three through a proceeding before the Secretary of the Interior. That property has passed beyond the jurisdiction and control of the Secretary of the Interior and the legal title thereto is now vested in appellees, and the Secretary of the Interior is without power to declare a trust. The general rule above adverted to is laid down in the Case of Broderick's Will, 21 Wall. 503, 512, 22 L.Ed. 599.[1] The court in that case recognized that there were exceptions to the general rule and that it was not applicable where the probate court could not afford an adequate remedy. In the opinion the court said:

"Where a remedy is within the power of the ecclesiastical court, either by granting or refusing probate of the whole will or codicil, or of any portion thereof a court of equity will not interfere. * * *

"It seems, therefore, to be settled law in England that the court of chancery will not entertain jurisdiction of questions in relation to the probate or validity of a will which the ecclesiastical court is competent to adjudicate. It will only act in cases where the latter court can furnish no adequate remedy.

"It is laid down in the Duchess of Kingston's case, 20 Howell's, St.Tr., 544, it is true, that fraud will vitiate the most solemn adjudications of all courts; and so it will when set up in the proper manner by the proper parties and in the proper court. But a person who in contemplation of law has had a day in court, and an opportunity to set up the fraud, and has not done so, is forever concluded, unless he was ignorant of its perpetration, in which case he will be entitled to set it up whenever he discovers it, if not himself guilty of laches.

"The same principles substantially have been adopted by most of the courts having equity jurisdiction in this country."

Mr. Freeman in his work on Judgments, 5th Ed., Vol. 3, § 1185, in discussing the general rule, says:

"And where the statutory provisions or the circumstances are such as not to afford

[1] See, also, Simmons v. Saul, 138 U.S. 439, 459, 11 S.Ct. 369, 34 L.Ed. 1054; Montgomery v. Gilbert, 9 Cir., 77 F.2d 39, 42, 43.

It should be observed in the case last cited that the court concluded that the laws of Montana, the state in which the will was probated, provided ample means for the revision and correction of the probate decreed by the probate courts thereof.

the full and adequate relief which may be obtained in a court of equity, its protection should on principle be extended, not, perhaps, to vacate the decree, but to avoid its inequitable operation. And independent of any statutory provision for equitable relief, it has been held in some cases that this may be done."

The text is supported by Smith v. Boyd, 127 Mich. 417, 86 N.W. 953, and Smith v. Harrison, 2 Heisk., Tenn., 230.

Other courts, recognizing that since the probate of a will is a matter exclusively within the jurisdiction of the probate court, equity may not set aside the probate, have held that a court of equity on proper equitable grounds may declare the beneficiary a trustee for the person rightfully entitled to the property.[2]

Moreover, there was no probate of the will before the Secretary of the Interior in the true sense of that term. A will is merely approved or disapproved by the Secretary of the Interior and filed for record in the Department of the Interior. See Blanset v. Cardin, 8 Cir., 261 F. 309, 312. And the approval or disapproval does not follow an adversary proceeding, but merely an ex parte investigation by the Examiner of Inheritance. Furthermore, Lilia alleges she had no knowledge of the facts upon which she predicates her right to relief until after the will had been approved and that when she petitioned the Secretary of the Interior to reconsider the approval, he denied her a hearing.

We conclude that with respect to the property in class three, Lilia had no remedy before the Secretary of the Interior, that with respect to such property the case falls within an exception to the general rule, and that on the facts pleaded she is entitled to equitable relief.

We adhere to our former opinion and the petition for rehearing is denied.

---

[2] Patterson v. Dickinson, 9 Cir., 193 F. 328, 334; Caldwell v. Taylor, 218 Cal. 471, 23 P.2d 758, 759, 88 A.L.R. 1194; In re Walker's Estate, 160 Cal. 547, 117 P. 510, 511, 36 L.R.A.,N.S., 89; In re Ross' Estate, 180 Cal. 651, 182 P. 752, 754; Sohler v. Sohler, 135 Cal. 323, 67 P. 282, 284, 285, 87 Am.St.Rep. 98; Barnesly v. Powel, 1 Ves.Sr. 284, 287; Sumner v. Staton, 151 N.C. 198, 65 S.E. 902, 907, 18 Ann.Cas. 802; Pomeroy's Eq. Jur., 4th Ed., Vol. 2, § 919, p. 1923; Id., Vol. 3, § 1154, pp. 2697–2720.

In Sohler v. Sohler, supra, 135 Cal. 323, 67 P. page 285, the court said: "In Barnesly v. Powel, 1 Ves.Sr. 284, * * * Chancellor Hardwicke thus spoke: ' * * * it is certainly now settled by the lords, in Kerrich v. Bransby (7 Brown, Par.Cas. 437), that this court cannot set aside a will of personal estate for fraud. * * * But there is a material difference between this court's taking on them to set aside a will of personal estate on account of fraud or forgery in obtaining or making that will, and taking from the party the benefit of a will established in the ecclesiastical court by his fraud, not upon the testator, but upon the person disinherited thereby, and claiming after the testator's death against it.' It thus became the principle of the English courts of chancery, while permitting the probate to stand, as having no power to set it aside, to decree that the false legatee or wrongful executor was trustee for the rightful claimant. So here we hold that under our system the utmost that the court in equity could do, if it finds the facts to be as alleged, would be to decree that the defendant Paul Reuss holds title as trustee of the minor plaintiffs, and compel him to make conveyance and transfer to them accordingly of all that he may have obtained from the estate of the deceased to which they were entitled, or, if a conveyance of specific property may not be had, then to hold him accountable to the plaintiffs for the value thereof. This we believe to be the limit of the power in equity in dealing with the matter, and it is in accordance with the principle adopted by the English courts, expressed by Pomeroy as follows: 'Where probate is obtained by fraud, equity may declare the executor or other person deriving title under it a trustee for the party defrauded.' Pom. Eq. Jur. § 919, and note."